## BRUUN et al. v. HANSON et al.

### No. 8887.

Circuit Court of Appeals, Ninth Circuit.
April 20, 1939.

Rehearing Denied May 22, 1939.

Ralph S. Hamilton and Bronaugh & Hamilton, all of Portland, Or., and O. C. Moore, of Spokane, Wash., and W. Lair Thompson and McCamant, Thompson, King & Wood, all of Portland, Or., for appellants.

A. N. Whitlock, of Seattle, Wash., for appellees Harrison and Sunshine Consolidated, Inc.

A. L. Morgan, of Moscow, Idaho, for appellees Hanson and Bean.

Therrett Towles, of Spokane, Wash., and W. F. McNaughton, of Coeur d'Alene, Idaho, for appellee Sunshine Extension Mines Co.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

This litigation arises out of the disposal of certain mining properties, at one time owned by one Charles Gullickson, deceased, for stock in a corporation, and an agreement made by the heirs of deceased, with the administrator of his estate and the latter's attorney, by which the administrator and the attorney obtained a part of the stock in payment of their claims against the estate.

The mining claims in question consist of about 153 acres and lie in Shoshone County, Idaho, about six miles from the town of Kellogg. To the east of the claims, and adjacent thereto, is the property of the Sunshine Mining Company, a Washington corporation, the active mine workings of which extend within a few hundred feet of the eastern boundary of the Gullickson claims. North of the Gullickson claims is the Crescent Mine, the active mine workings of which extend within a few hundred feet of the northern boundary of the Gullickson claims. The Crescent Mine is owned or controlled by Bunker Hill & Sullivan Mining & Concentrating Company, whose holdings, directly or through subsidiaries, in general, extends west about two miles and then southward. Thus between the Bunker Hill boundary on the west and the Sunshine Mining Company on the east, roughly speaking, is a strip of land about two miles long, and bounded on the north by Bunker

Hill property. In the northeast corner of that strip, lie the Gullickson claims. A small group of claims, claimed by McIlwee and Rairden divided the Gullickson claims.

In the two-mile strip mentioned, were several other groups of claims. One group was claimed by American Lead Mines, Ltd., and was south of the Gullickson claims. To the west of both of these groups, were the claims of Carl Arenander, which upon his death were held in his estate. Between the Arenander group and the Bunker Hill boundary at the western end of the strip was a group of claims owned by Rockford Mining Company, Limited, of which Walter H. Hanson was president. Interspersed between these various groups were a few other claims, and some unlocated land in the public domain.

Deceased and his brother were the owners of the claims until the latter's death about 1910, when deceased bought from appellants their interest in the claims as heirs of the deceased brother.

On July 24, 1928, Gullickson brought suit in a state court in Idaho against Sunshine Mining Company, to quiet title to some of the claims. He was represented by Walter H. Hanson, who had been his attorney for many years. By stipulation, after removal to the federal court and after answer, the cause was dismissed without prejudice on June 3, 1929.

On June 12, 1929, Gullickson brought suit against McIlwee and Rairden to quiet title to some of the claims, in a state court in Idaho. McIlwee and Rairden filed an answer and cross-complaint seeking to have their title to the claims quieted. While that suit was pending, and on March 6, 1930, when he was about 77 years old, Gullickson died, leaving as his sole heirs his two sisters, who were and are residents and subjects of Norway and are appellants here.

Appellant Hilda Bruun was about 66 years old at the death of Gullickson. She had a public school education which she finished when she was 14 years old. She had never been outside Norway. She understood, spoke and wrote the Norwegian language only. The only business she had ever engaged in was sewing men's ties. She had three sons: Sigurd was 43 years old and was engaged in the electrical installation business, had had a "Technical High School" education, but did not understand the English language; Bjarne, age 39, hereinafter called Bruun, was a seaman, and fully understood the English language; Frithjof, age 36, was educated as an "office clerk", assisted Sigurd in his business, was engaged in the sale of an American invention to prevent punctures of automobile tires, and understood and wrote the English language. Sigurd and Frithjof were fairly successful in their business ventures.

Appellant, Benedicte Solum, was about 70 years of age at Gullickson's death. She had never been outside Norway. She had had a public school education which she finished at age 14. She understood, spoke and wrote the Norwegian language and understood the Swedish and Danish languages, but did not understand English. For many years she had worked for a corporation in Norway, selling food over the counter.

The correspondence and other documents sent appellants by Hanson and Hull, hereinafter mentioned, were written in English. Frithjof would translate them, and appellants, after discussing the various matters with Sigurd and Frithjof, would make a decision, which would be set forth in a letter written by Frithjof and signed by appellants, when it was not necessary to execute documents. Practically all the correspondence written by Hanson was addressed to Benedicte Solum, but for brevity, we will refer to it as addressed to appellants.

On March 18, 1930, Hanson wrote appellants, advising them of Gullickson's death, and regarding the mining claims stated: "He owned a group of mining claims on Big Creek in this county, close to a producing mine, which is a valuable piece of property. So far as I know it has no ore in commercial quantities and in order to prospect or develop it in an effort to make a mine out of it, it will require the expenditure of a great deal of money * * *" He also stated that Gullickson had received several offers to purchase the property, varying from $25,000 to $35,000 but which were refused, and that "I will have an administrator appointed by the court to take charge of the estate." On the following day Hanson again wrote appellants asking for dates and other details.

Appellants answered these letters on April 9, 1930, saying:

"* * * In his [Gullickson's] letters he has very often named you and Mr.

Coumerihl as his particular friends, whom we could fully rely upon in case anything should happen to him. So we are entirely thankful, Mr. Hanson, that you are willing to take on the winding up of his estate, and we are sure you will do your best to have it settled in the best way * * *

"After having conferred with each other we ask you, Mr. Hanson, kindly arrange his estate in your best judgment [sic], as we understand that we no opinion can have as regards the details in the matter in spite of the fact that he during the years has kept us proportionally well informed of his affairs. However, we would point out that it might be desirable to have the estate cleared off in the shortest time possible, yet such as the individual sales being not forced at too much expense of the values."

On May 3, 1930, one Hayes, a stranger to all the proceedings here, wrote Bruun, who was then in San Francisco, advising him to go to Idaho and settle the litigation with McIlwee and Rairden. The attorney for the Norwegian consulate in San Francisco wired Hanson on May 9, 1930, stating that Bruun had applied for advice about administering the estate of Gullickson. Hanson wrote the attorney on May 13, 1930, stating that Bruun would have to be a citizen of the United States and a resident of Idaho, before he could be appointed administrator.

Hanson filed a petition in a probate court in Idaho praying for the appointment of Dr. J. R. Bean, as administrator, and Bean was so appointed on June 4, 1930. On that day appellants wrote Hanson, enclosing the letter of Hayes to Bruun, sent them by the latter, saying that "We have discussed the matter together with Hilda's two other sons, and of course we find no reason for making any change in consequence of the letter from Hayes" and that they preferred the litigation against McIlwee and Rairden to be settled without a lawsuit.

Hanson wrote appellants on June 17, 1930, that Bean, Gullickson's "old friend" had been appointed administrator, and that an inventory and appraisement would be made and sent soon showing the value of the property to be less than market.

Appellants wrote Hanson on October 6, 1930, that Bruun, who had returned to San Francisco, was proceeding to Idaho, that he could do such work on the mining claims which Hanson had theretofore hired done, that he was to be paid by the estate, and: "Besides, as it may possibly happen that you on a prospective sale or other events in the matter would be obliged to come to a speedy decision, it might be advantageous to have him at the place as our representative, as he approximately knows what conclusions we would make up in each individual case." Bruun negotiated for settlement of the litigation with McIlwee and Rairden, and also for sale of the mining claims. Appearing in the record is a document entitled "Declaration" signed by appellants, wherein they agreed to sell the mining claims for not less than $15,000 to Sunshine Mining Company, the latter to settle with McIlwee and Rairden. Nothing came of that transaction. On December 6, 1930, appellants executed a document entitled "Authorisation" [sic] wherein they authorized Hanson and Bruun "in co-operation—without further authorisation [sic]—to sell the property of the estate".

Appearing in the file of the probate proceeding is a claim, verified by Hanson on December 1, 1930. A fee of $3,500 was claimed therein for his services in the first state court suit, but there is no claim therein for a fee for services as attorney for the administrator, or for services in the suit against McIlwee and Rairden. The claim contains an endorsement showing Bean's approval thereof on January 16, 1931, but contains no endorsement showing the approval of the probate judge or that it was filed.

Bruun's negotiations with McIlwee and Rairden were more fruitful. On January 7, 1931, they entered into an agreement, also signed by Hanson as attorney for the estate, to be effective on approval by appellants, wherein McIlwee and Rairden agreed to accept ⅖ of the sales price of the claims in the event of sale, in settlement of the litigation. It was also provided that the claims might be sold for more than $20,000 if any one of the parties so desired, but could not be sold for less than that sum unless all parties agreed.

Bruun entered into an agreement with one Crane, on January 10, 1931, wherein Bruun agreed to recommend acceptance of an offer of $5,000 and $3,000 in stock of a corporation to be formed to take title to the claims, and payment of all debts against the estate and expenses of adminis-

tration by Crane. Hanson wrote appellants on January 14, 1931 about the Crane "deal" saying "We think it is a good one"; that he and Bean had agreed to take stock in the proposed corporation for their claims; and that he was sending a power of attorney in order to "be able to act quickly" and that Bruun "will not use this except in making a deal that has been approved by you".

Appellants executed the power of attorney to Bruun, on February 6, 1931, authorizing him "to agree and/or contract for the sale of and to sell and convey any and all property, real, personal or mixed * * * either by private contract or public auction * * * for such prices or upon such terms as to him shall seem advisable and to and for our best interests, it being our intention by this instrument to authorize him to accept, receive, sell and/or otherwise dispose of all property of every kind, nature and description which we may be entitled to receive from the estate of Charles Gullickson, deceased * * *" Appellants wrote Hanson on February 9, 1931, saying that they had sent the power of attorney; that they had learned of the possible sale of the mining claims; that "we are much obliged to see that you and Mr. Bean are willing to take your fees in stock in the planned company" and: "We find it best leaving to [Bruun] to make the finite decision in this matter, as we have of course no opportunity of such intimating ourselves of the different questions that we can have any useful influence on them."

On March 13, 1931, Bruun presented a petition to the probate court, detailing the agreement with McIlwee and Rairden, and prayed for approval thereof, that Bean, as administrator be substituted as plaintiff in the state court suit, and that he be authorized to obtain a decree in the state court suit quieting title to three-fifths of the claims in the heirs of deceased and quieting title to two-fifths of the claims in McIlwee and Rairden. The probate court granted the petition on March 23, 1931. Pursuant thereto the parties in the state court suit, on April 1, 1931, stipulated that Bean, as administrator be substituted as plaintiff, and that the court might make findings in a form attached. On April 20, 1931, the state court made findings and a decree quieting title as stated. By the proceeding McIlwee and Rairden obtained a two-fifths interest in some claims which were not in litigation.

Nearly a year after Bean's appointment as administrator, on May 12, 1931, the inventory and appraisement of the estate was filed. It disclosed:

| | |
|---|---:|
| Cash on person and in banks... | $ 1,376.60 |
| Cash in Norway bank.......... | 8,713.71 |
| Other personalty ............. | 5.25 |
| City lots ..................... | 2.00 |
| Hunter Mining District claims.. | 2.00 |
| Three-fifths interest in claims in question ................... | 12,000.00 |
| | $22,099.56 |

On June 6, 1931, Bean wrote Bruun stating that the "fees" against the estate would be $1,004 to him and the same amount to Hanson for expenses of administration; that Hanson's fee in connection with the first state court suit was $3,500 and his fee in connection with the second state court suit was $300. On July 10, 1931, appellants wrote Hanson that they had received Bean's statement from Bruun, and:

"We find these amounts immensely large, especially as we cannot see that there has been done anything positively. The estate is not yet closed and the property remains still unsold.

"As neither [Bruun] nor we are in possession of the necessary juridical competence to control these affairs we have today applied to the Norwegian Consul at San Francisco and left to him henceforth to take care of our own interest in the estate."

On the same day, appellants wrote the Norwegian Consulate at San Francisco requesting assistance in winding up the estate.

The agreement with Crane was not carried out. On July 13, 1931, Bruun entered into an agreement with Hanson and Bean that the stock to be issued to them under another agreement was to be "accepted in full satisfaction" of their claims against the estate. The other agreement referred to, was one executed on July 15, 1931, between Bruun, Hanson, Bean, McIlwee and Rairden. It provided that Hanson, who was to advance expenses, would cause a company to be incorporated under the laws of Arizona "for one million shares of the par value of not more than $1.00

per share," which was to acquire the mining claims in return for its stock which was to be issued as follows:

| | | |
|---|---|---|
| To McIlwee | 100,000 | shares |
| To Rairden | 100,000 | shares |
| To appellants | 125,000 | shares |
| To Hanson | 340,000 | shares |
| To Bean | 60,000 | shares |
| Total | 725,000 | shares |

It was. also provided that the stock to be issued to appellants and McIlwee and Rairden would be non-assessable so long as they held it, and that all of the stock would be pooled for 18 months, unless sooner released by the board of directors, which might, if it desired, extend the pool not exceeding six months.

Bean filed his final account and petition for distribution on July 25, 1931. He stated that an agreement had been entered into regarding incorporation; that his statutory claim was $1,000; that Hanson's claim for the first state court suit was $3,-500, and that his claim for the second state court suit and for services as attorney for the administrator was approximately $2,500; that he and Hanson had agreed to take stock for their claims. He prayed that the agreement of July 15, 1931, be ratified and approved, that he be authorized to make a deed covering the claims to the corporation when organized, and "that distribution of stock be made as set out in the petition". Bruun approved the petition in writing.

Apparently Bruun had written appellants regarding the agreement of July 15, 1931, for on July 28, 1931, appellants cabled Bruun: "accept incorporation" and at the same time cabled the Norwegian Consulate at San Francisco to "countermand" the letter of July 10, 1931.

On August 4, 1931, Hanson answered appellants' letter of July 10, 1931, saying in effect that he considered his fees very reasonable, and in that connection said that while the first state court suit was pending, deceased received offers of from $25,000 to $150,000 for their claims. He also explained about the proposed corporation, how the stock was to be divided, and that since the stock which appellants were to receive was non-assessable "it is really preferred stock". He also said that "if I could get a moderate sum of cash I would a whole lot rather have it than the stock".

Bruun, on August 26, 1931, as attorney in fact for appellants by deed conveyed appellants' interest in the claims to "Walter H. Hanson, as Trustee for Sunshine Extension Mines Company, an Arizona corporation to be formed".

Appellants, on September 8, 1931, wrote Hanson, saying: "As far as we can see there have been many difficulties with this matter, and we are thankful for your having arranged it in the best way for us, and thus we accept the agreement of the incorporation".

The final decree of distribution in the probate court was made on September 30, 1931. One recital therein was: "And it further appearing to the Court, and the Court finds, that said arrangement is a reasonable arrangement, that it had been made with the consent and with the approval of the heirs, and that it has been approved by their personal representative and attorney in fact". It was ordered that Bean execute a deed to the mining claims upon completion of the incorporation, provided that McIlwee and Rairden simultaneously executed a deed and provided that the stock was issued according to the agreement of July 15, 1931. The order discharged Bean upon payment and delivery of the residue of the estate and the filing of proper vouchers. About this time Bruun left Idaho and did not return.

Articles of incorporation of Sunshine Extension Mines Company, hereinafter referred to as the Arizona company, were filed in Arizona. It was provided therein that the stock of the corporation was assessable. Hanson, Bean and Hanson's wife were elected directors; Hanson was named president; and Bean was named secretary. Hanson advised appellants of the incorporation by letter dated November 17, 1931. The articles of incorporation of the Arizona company were filed with the Secretary of State of Idaho on November 23, 1931.

Bean, as administrator, executed a deed covering the mining claims to the Arizona company on November 30, 1931. On the following day the articles of incorporation of the Arizona company were filed in the county where the mining claims were located.

McIlwee and Rairden conveyed their interest in the claims in question on January 25, 1932. Hanson sent to appellants on February 1, 1932, a receipt issued by the Arizona company, stating that they were

entitled to receive 125,000 shares of its stock when the same was released from the pool. On the following day, Hanson, as trustee, executed a deed covering the claims to the Arizona company, and filed it, together with the deed previously made by Bruun for record.

Appellants wrote Hanson on February 16, 1932, that they thought they were entitled to $1,100 more from the estate than they received, to which Hanson replied on February 29, 1932, that he would have the probate judge answer the letter.[1] Appellants acknowledged having received the receipt issued by the Arizona company on March 19, 1932.

Bruun returned to Norway on November 5, 1932. On January 23, 1933, Hanson wrote appellants that "some people" were willing to take an option on appellants' stock for 5¢ a share, to be exercised within 18 months, of which 25% would be charged as commission. Appellants testified that while they had trusted Hanson implicitly prior to receipt of that letter, they began to distrust him then. On March 3, 1933, appellants wrote Hanson saying that 5¢ was "a very law [low] price, and the sale commission of 25 per cent to be uncannily high" and "having in this short time been unable to intimate ourselves adequately with the matter, we do not want you to consider this as any authorization to sell our stock on these conditions". On the same day appellants wrote one Hull, an attorney, about representing their interest in the Arizona company.

On March 24, 1933, Hanson, by letter agreed that the 5¢ price was low, said that the "deal" referred to in the letter of January 23, 1933, "fell through", and "if we find that we are going to have to do the assessment work this year, all the stockholders will have to join in the expense, as I certainly cannot and will not carry the burden myself."

Hull wrote appellants on April 13, 1933, that he would be willing to represent their interest for 12½% of the stock or its sale price, asked for a power of attorney, and said: " * * * this property is located near or adjoining the Sunshine mine, which is one of the most promising of the younger mining properties in this district. It runs high in silver and has been able to operate at a profit, notwithstanding the depressed conditions of the market generally. For that reason you should be cautious in disposing of this stock."

About this time, appellee Harrison, an attorney, according to his testimony, conceived a plan to consolidate the various mining claims in the two-mile strip previously referred to, by organizing a corporation which would take title to the claims and issue its stock therefor. He began negotiations to that end, and discussed the plan with Hanson.

Hanson wrote appellants on May 15, 1933, asking again what they thought of disposing of their stock on the terms previously mentioned, and reiterating that there must be proportionate contributions by all stockholders for the assessment work. Before receipt of this letter appellants wrote Hanson on May 19, 1933, in answer to his letter of March 24, 1933, saying that "on looking into the matter we have arrived at the conclusion that it must be unjustifiable to sell the property on such terms and in this time with its depressed market conditions" and that they had engaged Hull "to take care of our interest in the corporation". Hull so advised Hanson by letter dated June 21, 1933.

Appellants answered Hanson's letter of May 15, 1933, on July 1, 1933, saying that "we are mostly inclined to wait till conditions improve, what we cannot just doubt they will do some day". On July 19, 1933, appellants executed a power of attorney authorizing Hull to represent them as stockholders in the Arizona company. It conferred no power upon Hull to sell the stock or release any claims held by appellants against anyone.

Meanwhile, Harrison was carrying out his plan, and had obtained title to the Arenander claims, the Crane claims, and those of the Rockford Mining Company, Limited and American Lead Mines, Ltd. On April 21, 1934, articles of incorporation of Sunshine Consolidated, Inc., hereinafter referred to as the Idaho company, were filed in Idaho. Hanson was one of five incorporators. Its authorized stock was 3,000,000 shares, having a par value of 25¢.

The directors of the Arizona company, on April 24, 1934, authorized Hanson and Bean to convey its claims to Harrison for 725,000 shares of stock in the Idaho company. On April 26, 1934, the incorpora-

---

[1] Appellants denied having received such a letter from the probate judge.

tors of the Idaho company met and on its behalf offered Harrison 3,000,000 shares of its stock and $75,000 in bonds, for all the mining claims above mentioned, held by various groups. Two days later, Harrison accepted the offer.

On May 3, 1934, Harrison wrote Hull explaining about the new corporation. On May 5, 1934, Hull sent a copy of this letter to appellants and stated his opinion "that the consolidation is for the best interests of all".

Harrison, and his wife, on May 7, 1934, executed a deed to all the claims of the various groups, including those owned by the Arizona company, to the Idaho company. Appellants wrote Hull on May 28, 1934, that they would be satisfied to enter the consolidation, and asked that the new stock be issued directly to them. On May, 31, 1934, the Arizona company deeded its interest in the claims to Harrison. That deed, as well as the one made by Harrison, were filed for record on July 3, 1934. Bean's deed, and the deed of McIlwee and Rairden were recorded on September 26, 1934. The stockholders of the Arizona company met and ratified the necessary steps in the transfer on October 8, 1934.

Harrison distributed the stock which he received from the Idaho company, as follows:

| | |
|---|---|
| To incorporators and directors .............. | 3,500 shares |
| To the Arizona company | 725,000 shares |
| To the estate of Arenander ................. | 100,000 shares |
| To Rockford Mining Company, Limited ......... | 415,557 shares |
| To American Lead Mines, Ltd. ................. | 289,250 shares |
| To Crane .............. | 160,000 shares |
| Donation to treasury..... | 750,000 shares |
| Bonus for sale of bonds and for engineering and other services ........ | 556,693 shares |
| Total .................. | 3,000,000 shares |

During 1935, the Idaho company located practically all the remaining public land in the two mile strip, and by the time it had completed that work, it claimed approximately 1500 acres of land.

On July 10, 1935, Harrison offered Hull $10,000 and 16,250 shares of Idaho company stock for appellants' interest in the stock of the Arizona company. Hull cabled appellants to that effect and recommended acceptance. On the following day, appellants replied "accept". Pursuant thereto, Hull on July 19, 1935, assigned appellants' interest in the stock of the Arizona company to Harrison, as attorney in fact for appellants. At Harrison's insistence Hull, as attorney in fact, also executed a release, relinquishing any claims held by appellants against Harrison, Hanson, the Arizona company, its officers and directors.

On July 25, 1935, Hull remitted the $10,000, less his commission, and stated he had agreed to sell the 16,250 shares of Idaho company stock, less 12½% thereof retained as his commission for 75¢ a share. He made no mention of the release, at that time or thereafter, so far as the record discloses. Appellants, on August 20, 1935, wrote Hull approving the acts Hull related. Hull received the money for the remaining shares on November 9, 1935, and cabled it to appellants, and wrote them to that effect on November 12, 1935.

On March 28, 1936, appellants received a letter from an official of the Foreign Department of Norway which led to the institution of this suit. That letter is not contained in the record. On June 17, 1936, appellants wrote Hull: "We very thankful for you to handle plain and level headed way of handling this matter for us. We want again thank you heartily for your work in our case and if in the future want juridical assistance in America will address you again."

The bill herein was filed on August 31, 1936. The bill, in general, charged that Hanson and Bean conspired "to gain control over and directly or indirectly possess" the estate "or the major part thereof" and that the various transactions dealing with the disposition of the property were merely steps in the scheme to defraud. The bill further alleged that the appropriation of stock in the Arizona company by Hanson and Bean was fraudulent and without authority. There are other allegations that particular steps were accomplished by false representations, but the bill fails to precisely disclose whether relief from such particular steps is sought on that ground. Appellants prayed for a decree declaring that the mining claims, formerly held by Gullickson, are held in trust for appellants and that appellees be required to account for the gains and profits derived from the transactions; that if appellants could not for any reason ob-

tain the mining claims, then a decree be made declaring that the stock, derived from the transactions, is held in trust for appellants, and that appellees be required to account for the gains and profits derived from transactions involving the stock.

In addition to the evidence already related, appellants testified that they had been ill between the years 1930 and 1935; that until March 28, 1936, they had no knowledge of their rights as heirs or stockholders, were totally ignorant of American law in that respect, and at no time had knowledge of the value of mining claims in Idaho. Hanson and Bean both denied having conspired to defraud appellants. Several engineers testified at the trial that the value of the mining claims was still speculative, and that the chief value of the Gullickson claims was their location.

It also appeared that Bean had sold his interest in the stock of the Arizona company to Harrison, and received therefor $4,100 and 10,000 shares of stock in the Idaho company, which he later exchanged for stock in other mining companies, the latter not being identified either as to kind, value or amount.

It further appeared that after Hanson had delivered the stock in the Idaho company to the various owners for the claims acquired, Hanson was entitled to receive 340,000 shares of such stock as stockholder in the Arizona company, and was entitled to receive 283,712 shares of stock in the Idaho company, as stockholder in Rockford Mining Company, Limited. Hanson sold his interest in the Arizona company to Harrison, but the record does not disclose what he received therefor, except his statement that he received "share for share". Thereafter he joined a syndicate made up mostly of stockholders of Sunshine Mining Company and transferred some stock to it, and had various transactions about which the record is insufficient to enable an accounting.

The trial court found that both Bean and Hanson acted fairly and honestly, and that "there was no fraud whatever perpetrated upon" appellants or "breach or abuse of any trust or trust relation". The court further found that Hanson's fee for the first state court suit in the sum of $3,500 was reasonable and proper, and that he was entitled to a fee for his services as attorney for the administrator, and for his services in the suit against McIlwee and Rairden, but did not find the amounts

thereof. The court entered a decree dismissing the bill on the merits, and appellants brought this appeal.

 Relief in equity was herein sought. The federal courts may give "relief according to the recognized rules of equity, as administered in the courts of the United States". Arrowsmith v. Gleason, 129 U.S. 86, 9 S.Ct. 237, 241, 32 L.Ed. 630. Formerly, such courts exercised an independent judgment in determining what "the recognized rules of equity" were, but now the local law in that respect is binding. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

 Appellants seek to obtain, among other things, the two-fifths interest in the mining claims, or in the alternative, the amount of stock representing that interest, which was decreed by the state court to be owned by McIlwee and Rairden. It is asserted that appellants are not estopped by that decree because the parties in that proceeding were different than those now before the court. The proceeding was pending in the state court when Gullickson died. Bean, as administrator was substituted as a party in the place of deceased, as permitted by 1 Ida.Code, Ann., 1932, § 5-319. Although appellants might have been substituted, alone or jointly with Bean, they were not required in the proceeding. 1 Ida.Code, Ann., 1932, § 15-410. The decree determined title to two-fifths interest in McIlwee and Rairden, as against those claiming under Gullickson. As such, we thing it is binding upon appellants, unless it may be attacked for other reasons.

### Attack on the Decree Quieting Title.

 In Idaho, such a decree may be attacked on three grounds only: (1) lack of jurisdiction of the parties; (2) lack of jurisdiction over the subject-matter; and (3) fraud in some cases. Harkness v. Utah Power & Light Co., 49 Idaho 756, 291 P. 1051. It is not urged that the decree was void because the state court did not have jurisdiction over the parties.

### Jurisdiction of the State Court.

 Appellants contend that the state court did not have jurisdiction over the subject-matter determined by the decree. It is said that the power of attorney was insufficient authority to authorize division of the property because it must have the

same certainty as is required for a deed, and that it authorized Bruun to sell the property only for money. We do not agree with these contentions. The power of attorney authorized Bruun to sell "or otherwise dispose of all property of every kind, nature and description" which appellants might be entitled to receive from Gullickson's estate. We think the power of attorney was completely sufficient in terms, and that the terms authorized Bruun to "otherwise dispose" of appellants' interest by releasing appellants' claim to a two-fifths' interest in return for a release by McIlwee and Rairden of their claim to the three-fifths' interest.

It is further contended that the court could not create title, but only confirm it; that either Gullickson owned the whole of the claims or McIlwee and Rairden did; and that by its decree the court attempted to create title. This contention is without merit, we believe, because the contract and the stipulation approving the proposed findings "created" the title, and the decree merely confirmed what the parties created.

*Fraud.*

The only fraud alleged in the bill is that Hanson and Bean conspired to deprive appellants of the mining claims and obtain them, or a major interest in them, directly or indirectly, for themselves. We think that it is unnecessary to here mark out the boundaries of the frauds for which a judgment may be impeached, because it is apparent that no fraud was committed as alleged by the compromise of the state court suit. If McIlwee and Rairden owned all the claims, then appellants cannot complain of getting more than that to which they were entitled. On the other hand, if Gullickson owned all the claims, then McIlwee and Rairden got more than that to which they were entitled. Neither pleading nor proof shows that Hanson and Bean colluded with McIlwee and Rairden to obtain the two-fifths interest and there is nothing to show that Hanson and Bean did obtain it. So far as the record here discloses, there was present a controversy between two groups, each claiming particular property. Both groups had the right to settle the controversy by restricting their claims and dividing the property.

We hold that appellants may not, for the reasons urged herein, attack the decree quieting title.

### The Remaining Three-Fifths Interest in the Mining Claims.

Upon execution of the decree in the state court, title to three-fifths interest in the mining claims was free of the claims of McIlwee and Rairden. Title to that interest had vested in appellants upon Gullickson's death. Kline v. Shoup, 38 Idaho 202, 209, 211, 226 P. 729. Appellants, through Bruun as their attorney in fact, on August 26, 1931, conveyed that interest to Hanson, as trustee for the Arizona company, which we may here treat as a conveyance direct from appellants to the Arizona company, for the fact that the latter as beneficiary was not then in existence does not affect the validity of the trust. 1 Restatement of the Law, Trusts, 14, § 2j.

*Fraud.*

It is contended that the conveyance was obtained by fraud. One charge of fraud is that Hanson represented that the stock would be fully paid and non-assessable, and it is asserted that such promise "was contrary to law and incapable of performance". Appellants rely on Seyberth v. American Commander Co., 42 Idaho 254, 245 P. 392, but that case lends no support to the statement, and probably could not control even if it did, for the law of Arizona would control the rights and liabilities of the Arizona company in that respect, excepting, possibly, those cases where the Arizona law might be contrary to the public policy of Idaho. In the absence of an Arizona statute or decision we are compelled to uphold the validity of such promise. Dickerman v. Northern Trust Company, 176 U.S. 181, 202, 203, 20 S.Ct. 311, 44 L.Ed. 423. Such rule does not conflict with any rule in Idaho, for there such contracts are upheld. Mantle v. Jack Waite Min. Co., Ltd., 24 Idaho 613, 135 P. 854, 136 P. 1130.

It is further urged that the deed was merely a step in the conspiracy to defraud appellants and obtain the mining claims. In this connection, however, we think appellants misconceive their theory. Hanson and Bean at no time obtained the mining property. The conspiracy, if there was one, must have been to obtain the stock, else it failed of its purpose. So far as the Arizona company is concerned, there is no evidence of fraud in obtaining the deed. If the mining claims were worth $750,000 as alleged by appellants, there

was no unfair advantage taken of the owners, for they received stock having a par value of $725,000. On the other hand, if the mining claims were worth only $20,000, appellants cannot complain that they received more than that to which they were entitled.

The contract of July 15, 1931, by which the transfer was agreed upon, discloses no fraud or conspiracy in so far as the conveyance is concerned. The conspiracy or fraud, if any, is in the agreement to divide the stock. Theoretically, we think the effect of the agreement is that appellants and McIlwee and Rairden agreed to transfer their interest in the claims for 725,000 shares of stock, and that appellants also made an agreement with Hanson and Bean to deliver them 400,000 shares of such stock in payment for their services and claim. The fraud, if any, is in this latter agreement, and is a transaction entirely separate from the agreement to convey. We hold that the conveyance of the mining claims may not be set aside on the ground of fraud. Compare: Swinehart v. Turner, 44 Idaho 461, 259 P. 3.

*Validity of the Conveyance.*

■ In this connection, appellants contend that the deed of Bruun to the Arizona company did not convey title to it because the power of attorney was insufficient to authorize a conveyance for anything but money. As stated above, however, we think the authority to "otherwise dispose of all property of every kind" was sufficient power to make the conveyance.

■ Appellants also contend that the deed to Hanson as trustee was void under 2 Ida.Code, Ann., 1932, § 29-505, which declares conveyances to foreign corporation prior to filing certain required documents, to "be absolutely null and void". However, any defect in this respect was removed by Idaho Laws of 1937, Ch. 66, p. 88, expressly declaring such conveyances valid, and removing the declaration that they were void. Appellants contend, however, that since Article 11, § 10 of the Idaho constitution prohibits a foreign corporation from "doing any business" in that state without having a known place of business and an authorized agent, the legislature could not authorize or ratify a transaction which amounts to doing business. However that may be, we think it is clear here that the mere taking of title did not constitute doing business in Idaho. War Eagle Consol. Min. Co. v. Dickie, 14 Idaho 534, 94 P. 1034.

■ Finally, appellants contend that if the mining claims were worth only $20,000, then the stock was void because $725,000 par value was issued. While that might be a ground of complaint by creditors, appellants are in no position to complain that they got too much. Anderson v. Avey, 9 Cir., 272 F. 664, 666; Cunningham v. Holley, Mason, Marks & Co., 9 Cir., 121 F. 720.

### Rights of Appellants.

■ Appellants, as other individuals dealing at arm's length, of course had the right to transact business with others, honestly, and without commission of fraud by the latter, but as will be shown, appellants had other rights.

■ Bean, as administrator, was trustee of the property of the estate, and there existed between him and the estate and the heirs, a fiduciary relationship. In re Estate of Blackinton, 29 Idaho 310, 328, 158 P. 492; Schneeberger v. Frazer, 36 Idaho 737, 747, 213 P. 568; Flynn v. Driscoll, 38 Idaho 545, 558, 223 P. 524, 34 A.L.R. 352; In re Estate of Fleshman, 51 Idaho 312, 319, 5 P.2d 727; State Insurance Fund v. Hunt, 52 Idaho 639, 645, 17 P.2d 354; Uyeda v. Diefendorf, 54 Idaho 614, 616, 34 P.2d 65. Hanson as attorney for Bean, sustains the same relation. Compare: Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418; 3 Bogert, Trusts and Trustees, §§ 481, 482.

■ Among various duties of trustees, there is a general one described in 65 C.J. 652, § 520, as follows: "In administering the trust, the trustee must act for the beneficiaries, and not for himself in antagonism to the interests of the beneficiaries; he is prohibited from using the advantage of his position to gain any benefit for himself at the expense of the cestui que trustent, and from placing himself in any position where his self-interest will, or may, conflict with his duties as trustee, as a trustee is required to protect at all hazards, even to his own personal loss or disadvantage, the estate under his administration where his personal and individual interests conflict with those of the trust estate; and where a trustee uses trust property for his own personal advantage, plenary relief may be granted * * *"

■ One of the commonest illustrations where a conflict of interests appears, is a sale of trust property to the trustee individually. In such situations, the trustee should be attempting to sell the property for as much as possible to benefit the trust estate, while at the same time, as an individual, he probably would be attempting to buy the property for as little as possible. Regarding this situation it is said in 3 Bogert, Trust and Trustees, § 484:

"* * * In thus assuming the position of a buyer of the trust property, the trustee would be violating his duty of loyalty to his cestui. Ile would be injecting private interest into his management of the trust. This is an exceedingly dangerous line of conduct. Some trustees would take no advantage, or might even be so conscientious as to give themselves the worst of the bargain; but many would consciously or unconsciously manipulate the sale in such a way as to get the property for less than its actual worth.

"In its desire to avoid this danger to the cestui's interests and to remove this temptation from the path of the trustee, equity has forbidden such a purchase by the trustee, either directly or indirectly * *

"The fairness or good faith of the sale by the trustee to himself is immaterial. He may have paid the full value of the property, and been guilty of no concealment, misrepresentation, or other underhanded dealing. The cestui's option to avoid or use the constructive trust remains. Equity will not inquire into the fairness of particular sales. It realizes that, if it did, in many cases the unfairness would be so hidden as to be undiscoverable. The trustee might have had secret information of values which the cestui cannot prove he had. It is deemed better to give the beneficiary the opportunity to strike down all such sales, including some which are made in entire good faith, rather than to attempt the very difficult task of separating out those which are advantageous to the cestui and fairly conducted * * *"

The rule seems to have first been announced in the Supreme Court of the United States in Michoud v. Girod, 45 U. S. 503, 4 How. 503, 552, 11 L.Ed. 1076, and that court has consistently followed it since. A particularly appropriate case is Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 201, 65 L.Ed. 418, where a receiver entered into an agreement with his attorney and one Wilson to the effect that Wilson should purchase property owned by the receivership estate subject to a deed of trust, at the trustee's sale. It was said that there "was no evidence of any improper influence at the sale to prevent competition or to close competitive bidding or to bring about the sale to Wilson in preference to any one else". Notwithstanding that fact the court said that when the receiver entered into the agreement "he placed himself in a position in which his personal interests were, or might be, antagonistic to those of his trust"; that it "became to his personal interest that the purchase should be made by Wilson for the lowest possible price"; that the "course taken was one which a fiduciary could not legally pursue".

■ Turning now to the law of Idaho, 1 Ida.Code, Ann., 1932 § 15-745 provides: "No executor or administrator must, directly or indirectly, purchase any property of the estate he represents, nor must he be interested in any sale." Regarding this statute, it was said in Re Estate of Blackinton, 29 Idaho 310, 328, 158 P. 492, 498: "* * * The office of administrator of an estate being of a highly fiduciary nature, this statute may be considered as merely declaratory of the fundamental principle of trusteeship, which inhibits the trustee from dealing with the subject-matter of the trust in any way which may inure to his personal profit. * * *" Thus we find that the general rules stated above are the rules in Idaho by express statute.

## Breach of the Trustees' Duties.

■ As seen, Hanson and Bean each had the duty of refraining "from dealing with the subject matter of the trust in any way which may inure to his personal profit". In 1 Restatement of the Law, Trusts 531, § 201, it is said: "A breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary."

■ We think it is clear here that there was a violation by Hanson and Bean of their duties as fiduciaries. The conflict of interest was present. Individually their normal action would be to obtain as much of the stock in the Arizona company as they could for their claims, while as fiduciaries their duty would be to bargain for as little of such stock as they could.

700

While technically there was no "sale" in the sense that money was paid for property (see 23 C.J. 185, § 1), we doubt if that was necessary, for there was a "dealing with the subject matter of the trust". In addition, the whole purpose of the rule would be destroyed if the heirs were protected when the trustee paid money for property, but were not protected when the trustee used the simple device of releasing his claim for a particular amount of money for property. No doubt that reasoning led to the decision, so holding, in Re Estate of Blackinton, supra. There the heir conveyed property to the wife of the administrator for a promise of support and maintenance, which, in the last analysis, meant for services to be rendered, and the court held the transaction within the statute, if the administrator obtained an interest in the property. Here, appellants conveyed property to Hanson and Bean for their services rendered and to be rendered. We hold the transaction to be one forbidden by the statute.

## Appellants' Remedies.

*Nature and Extent.*

Undoing the transaction here would be of no aid to appellants. They would hold stock in the Arizona company, which if not now dissolved, owns no interest in the mining claims. By virtue of the stock in the Arizona company, Hanson and Bean were able to acquire the stock in the Idaho company. Thus, the latter is the product of the former. In that situation, appellants are entitled to a decree that Hanson and Bean hold the stock of the Idaho company, which they now own as the product of the Arizona company stock, as trustee for appellants (Zohos v. Marefolos, 48 Idaho 291, 281 P. 1114; 65 C.J. 968, § 891; 1 Restatement of the Law Trusts, § 202), and to account for the profits realized from any sale of such stock which was the product of the Arizona stock received from appellants (Jackson v. Smith, 254 U. S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418; 3 Bogert, Trust and Trustees, page 1517, § 484; 1 Restatement of the Law, Trusts, § 205(b) ), if they can now assert their remedies.

*Effect of the Decree of Distribution.*

It is contended by appellees that the decree of distribution authorized the transaction and therefore it precludes assertion of the remedies by appellants. In the decree of distribution, regarding the agreement for transfer of the mining claims and the stock, it was provided: "And it further appearing to the court, and the Court finds, that said arrangement is a reasonable arrangement, that it had been made with the consent and with the approval of the heirs, and that it had been approved by their personal representative and attorney in fact, Bjarne Bruun;" It also decreed that Bean executed a quit claim deed as administrator to the mining claims, upon condition that the Arizona company issue stock in amounts and to those specified in the agreement of July 15, 1931, and discharged Bean of his trust upon payment and delivery of the residue of the estate and filing of proper vouchers to that effect.

Under the law of Idaho an heir may convey his interest in real property to a third person before the final decree of distribution is made, and if the conveyance is undisputed, the probate court may order distribution thereof to the grantee or assignee. 1 Ida.Code, Ann., 1932, § 15-1315; In re Estate of Blackinton, supra. We may assume, as appellees contend, that the probate court may also order distribution of personal property, such as the stock here in question, to a transferee.

A probate court in Idaho has jurisdiction to "order and regulate all distributions of property or estates of deceased persons". 1 Ida.Code, Ann., 1932, § 1-1202. Regarding the final decree of distribution, 1 Ida.Code, Ann., 1932, § 15-1307, provides: "In the order or decree the court must name the persons and the proportions or parts to which each shall be entitled * * *. Such order or decree is conclusive as to the rights of heirs, legatees or devisees, subject only to be reversed, set aside or modified on appeal."

In Miller v. Mitcham, 21 Idaho 745, 123 P. 941, 942, it is said that the probate court has jurisdiction "to determine who are the heirs of a deceased person, and who is entitled to succeed to the estate and their respective shares and interests therein" and the "decrees of probate courts are conclusive in such matters". See also: Connolly v. Probate Court, 25 Idaho 35, 45, 136 P. 205.

On the other hand, the probate court has no jurisdiction to determine title to a particular share as between an heir

and his transferee. Coats v. Harris, 9 Idaho 458, 468, 75 P. 243; Miller v. Mitcham, supra; In re Estate of Blackinton, supra; White v. Smith, 43 Idaho 354, 253 P. 849, 853.

■ From the foregoing it is apparent that the probate court may determine who the heirs of an estate are, what the proportion is to which each is entitled in the estate, and to order distribution of the estate to the heirs in the proportions so determined. In the event of transfer by an heir of his share, the probate court may order distribution of such share to the transferee, if the transfer is not questioned, but in that event the order does not adjudicate validity of title between the heir and transferee, because the court has no jurisdiction to determine that question any more in the case where the transfer is unquestioned than it does when the transfer is questioned. The effect of the order in that respect is merely to protect the administrator as such against a charge of wrongful distribution.

■ The rules as thus determined by the Idaho court, comport with the general rules regarding the effect of judgments. Such a judgment is conclusive as to the issues actually raised, as well as those which could have been raised. In the event the transfer by the heir is unquestioned, no issue is raised in that respect, and not being raised is not decided, and since it is an issue which the probate court cannot determine, such issue is not one which can be raised for decision. If it is raised the court does not decide it, but orders distribution to the heir, and leaves the issue to be determined in a separate suit.

■ Since the distribution was here made to Hanson and Bean in their individual capacities, they stand in that respect as strangers or third persons to the estate and transferees of the heirs, and the final decree of distribution did not adjudicate the issue as between Hanson, Bean and the heirs, and the heirs are not estopped to raise the question now by reason thereof.

*The Release.*

■ Appellees contend that the release signed by Hull bars the right now asserted, but we think that Hull had no authority to execute the release. The power of attorney to him conferred no such authority, and in fact did not even authorize sale of the stock by Hull. Authority in that respect was conferred by cable and letter, but appellants at no time authorized or ratified the release, because there is nothing to show that it was ever brought to their attention.

*Ratification, Waiver and Estoppel.*

■■ It is asserted that appellants are now barred from asserting their remedies because they acquiesced in the agreement of July 15, 1931, for approximately five years. We are of the opinion that ratification and estoppel may not be invoked as a bar here. The acquiescence, consent or release from liability relied on by the fiduciary must have occurred when the cestui had full knowledge of the facts and of his rights before the cestui will be estopped from asserting his remedy against such fiduciary. 4 Bogert, Trusts and Trustees, §§ 941, 942, 943; 1 Restatement of the Law, Trusts, §§ 216, 217, 218; 2 Perry on Trusts and Trustees (7th Ed.) §§ 849, 850, 851; 65 C.J. 663, § 527. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege". Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

■ Here, the evidence is clear that appellants had no knowledge of their rights, until March 28, 1936, a time subsequent to all the acts relied on as acquiescence and waiver. At no time did Hanson or Bean advise appellants that their dealing with the trust estate was a violation of their duties as fiduciaries, and what their rights were. Under these circumstances we think appellants are not estopped, by acquiescence and waiver, from asserting their rights.

Hanson and Bean have pleaded laches as a defense. Appellants make no contention that 1 Ida.Code, Ann., 1932, § 15-742, exclusively controls the time limitation, and we express no opinion in that respect.

■ As stated in 1 Restatement of the Law, Trusts, § 219, many factors are to be considered in determining whether or not the defense of laches should be sustained. This suit was brought about five years after commission of the breach of trust, and about five months after knowledge was acquired by appellants of their rights in that respect. Appellants were aged and had practically no business ex-

702

perience. Since the product of the stock in the Arizona company is to be seized and an accounting of the profits made from the dealings in the product is to be made, the doctrine of "change of position" has little bearing here. We think it would not be inequitable to permit pursuit of their remedies by appellants. Compare: Diamond v. Connolly, 9 Cir., 251 F. 234; Olympia Mining & Milling Co. v. Kerns, 24 Idaho 481, 135 P. 255.

### The Relief to be Granted.

As previously indicated, the relief to be granted is that which will deprive Hanson and Bean of the profit they made with their transaction with appellants. Bean has received some $4,000 and some mining stock as a result of a transaction from which he was entitled to receive only $1,000. With respect to him, equitable relief will probably be comparatively easy to grant. With respect to Hanson, a slightly different position is present. His dealings are more involved and numerous. The court will require him also to account for his profit derived from his dealing with appellant, which would of course, mean the excess of money and stock he received over the amount of his claim against the estate and possibly necessary expenses in connection with subsequent transactions if the circumstances warrant it.

In this connection, appellants assert that the claim of Hanson in the probate proceeding which included $3,500 for services in the first state court suit should be disregarded. While it is true that the statutes require the probate judge to endorse his approval on the claim and require the same to be filed in the probate court (1 Ida.Code, Ann., 1932, §§ 15-607, 15-608), we think the final decree of distribution conclusively approved the claim. Such approval, if contrary to the statutes cited, resulted from an error of law which cannot be rectified. Donovan v. Miller, 12 Idaho 600, 88 P. 82, 9 L.R.A.,N.S., 524, 10 Ann. Cas. 444.

The record is wholly insufficient here to apprise us of the facts necessary to make a final decree, and the cause must be remanded for further proceedings. On the new hearing, the court below may dismiss the suit as against those appellees, other than Hanson and Bean, who have no product of the Arizona company stock, in their hands, belonging to Hanson or Bean.

The decree is reversed and the cause is remanded for further proceedings in conformity with this opinion.