**J. M. YOUNG and Kate Young, Plaintiffs in Error,**

v.

**WEST EDMOND HUNTON LIME UNIT, a body politic and corporate, Defendant in Error.**

**No. 35316.**

Supreme Court of Oklahoma.

June 15, 1954.

Rehearing Denied Sept. 28, 1954.

Dissenting Opinion Oct. 30, 1954.

306

John Barry, La Jolla, Cal., Wayne W. Bayless, Oklahoma City, for plaintiffs in error.

Robinson, Shipp, Robertson & Barnes, Oklahoma City, and George Hazlett, Cleveland, Ohio, for defendant in error.

WELCH, Justice.

The facts are not in dispute.

The plaintiffs owned the mineral interest and rights in a certain one-half section and a one-quarter section of land (total 480 acres). The mineral interests in these lands, in respective separate tracts, were leased to Sohio Petroleum Company, Stanolind Oil and Gas Company, and Peppers Refining Company. The said lands became productive of oil and gas, and adjoining lands also became productive of oil and gas. The whole area of proven productivity (several thousand acres) thereafter became designated as the West Edmond Hunton Lime Field, and was ordered unitized by the Corporation Commission, and to be operated and produced as a single unit, by the unit organization, in accordance with a plan of unitization submitted by the lessees of the various tracts in the field. Under the order of the Corporation Commission, and the "unitization statutes" then existing, 52 O.S.Supp.1949, § 286.1, et seq., the West Edmond Hunton Lime Unit, a body politic and corporate, was created as such unit organization. A committee, composed of the oil and gas lessees of the various separate tracts comprising the unitized area, and acting for the body corporate, selected Sohio Petroleum Company to operate and develop and produce the unitized area for the unit. This deprived the various lessees of any further right or authority or duty to operate their respective leased premises, or to produce oil therefrom.

Under the unitization plan, and according to law, a calculation was made of the potential productivity of each separate leasehold tract of land, and to each such tract there was allocated a stated percentage of all the oil to be produced by the unit organization from the whole area included in the unitization. That percentage was then divided seven-eighths to the respective tract lessee, and one-eighth to the respective tract lessor and thus a specified percentage of the overall production

of the entire unitized area was thereby allocated to each lessor and lessee in the area, without regard to where the oil was produced in the area.

Sohio Petroleum Company, Champlin Refining Company, Continental Oil Company and Phillips Petroleum Company were all purchasers of oil from the area at the beginning price of $2.65 per barrel. In the second year of the unit operation of the field, and during a period from September 28th to December 17th, the Phillips Petroleum Company, which had oil pipe lines or gathering lines throughout the unit area, posted a price of $3 per barrel for oil from the area, and continuously during said period offered to buy and bought from the unit and its operator a substantial portion of the oil produced from the unit area at such posted price. During such time, however, there was sale of some oil produced from the unit area to other purchasing companies and some of the unit oil was taken by the unit operator himself at and for the price of $2.65 per barrel. During such period of time the percentage of production of the unit operation allocated to the royalty interest of the plaintiffs amounted to 3,438 barrels, and the plaintiffs received the proceeds from such an amount of oil at a price of $2.65 per barrel.

The plaintiffs, in pleading, alleged, in substance, the foregoing state of facts and averred that the defendant, as agent and trustee of the plaintiffs, and others similarly situated, violated a duty owed to the plaintiffs, and others similarly situated, in that it failed to obtain $3 per barrel for such oil as was produced from the unit and allocated to the plaintiffs, and such others, in the certain period from September 28th to December 17th, and that plaintiffs thereby suffered a loss, damage and detriment in a sum equal to 35¢ per barrel alleged in pleading to be applied to 3,620 barrels of oil, or a total sum of $1,367, (in evidence by stipulation the above figure corrected to be 3,438 barrels), and it was alleged that the others similarly situated as the plaintiffs suffered loss of 35¢ per barrel accordingly, as to their respective interests in the production of the unit in such period.

The plaintiffs prayed that they have money judgment against the defendant and that the court enter judgment directing the defendant to account to and pay to all persons similarly situated as plaintiffs, owning royalty interests in the oil produced from the unit, the sum equal to 35¢ per barrel applied to their respective percentage interests in the total barrelage of oil produced from the unit during the said period from September 28th to December 17th.

The defendant, by answer, averred that it never at any time was authorized to market any unit production; that the manner and method of sale and disposition of the plaintiffs' part of the production from the lands within the unit was governed and controlled by the terms of oil and gas leases and division orders executed by the plaintiffs prior to unitization, and that plaintiffs have been paid for all production purchased from them under the terms of said leases and previous division orders; that the rights of other owners of mineral interests within the unit are not identical, and plaintiffs were without right to maintain the action as a class action.

In the oil and gas leases executed by the plaintiffs prior to unitization the lessees covenanted:

> "To deliver to the cerdit of lessor, free of cost, in the pipe line to which lessee may connect wells on said land, the equal one-eighth part of all oil produced and saved from the leased premises."

Prior to unitization the plaintiffs and their lessees, and assigns of their lessees, signed division orders addressed to an oil purchasing company wherein they each warranted their ownership in respective proportions of all of the oil produced from the said certain described lands, and wherein they authorized the oil purchaser company, until further notice, to receive their individual oil from the said certain premises for purchase from the said parties severally in the proportions named. The plaintiffs were named as owners of a one-eighth of the total production from the described lands.

At the close of all the evidence in the case a motion of the defendant for judgment was sustained, and judgment was entered for the defendant.

The plaintiffs contend that the division orders signed by the royalty owners before the unit was created did not cover the royalty owners' fractional interest in the common pool or source of supply, and that the defendant as the producer of the oil from the common pool, and in the absence of express directions from the plaintiffs as to a disposition of their share of the unit production, was bound to take or sell the plaintiffs' share, and account to the plaintiffs therefor on a basis of a price per barrel of not less than the market price available at the time the oil was run or produced, which is to say, at the highest market price available.

The defendant contends that it was not at any time under any obligation to the plaintiffs to market the plaintiffs' share of the oil produced from the unit area. That in any event, it could not be held responsible to the plaintiffs for the price paid and received for the plaintiffs' share of the production in the circumstance that the plaintiffs had designated a particular purchaser for their share of the oil produced from their own land by the division orders signed by the plaintiffs before unitization.

Obviously, an authorization to receive individually owned oil for purchase from wells located on a particular tract of land by the owners of the oil produced therefrom is not an authorization to receive other oil elsewhere produced.

After unitization the plaintiffs were no longer entitled to one-eighth of the oil produced by their lessee from their 480 acres of land. Instead, they were entitled to receive the fixed and stated percentage (allocated to them) of all the oil produced by the unit operator from the entire unit of several thousand acres. This might have been more, or might have been less than the one-eighth of the oil produced from their 480 acres, but at any rate, it was different from the oil they were entitled to receive under their original oil leases, and its sale was not governed by the original division orders which obtained while oil was produced wholly and solely from plaintiffs' land by plaintiffs' lessee.

Under the statutes, supra, authorizing unitized management of common sources of supply of oil, the owners of the mineral rights and interests in a particular tract of land are compelled to surrender all right to produce and take oil from the particular tract, and in lieu thereof they become entitled to a share in the total production by the unit organization from the common source of supply of which the particular tract is a part. Palmer Oil Corp. v. Phillips Pet. Co., 204 Okl. 543, 231 P.2d 997. And upon unitization the landowner lessors lost their right to have their contracted lessees develop and produce their individually owned acreage for the joint benefit of lessor and lessee, and instead the lessors looked to the unit organization to produce all acreage together as a single unit and to account to lessors for their allocated percentage of the aggregate unit production. Thus by statute when a tract of land becomes a part of a field brought under unitized management the owners of the mineral rights and interests in such particular tract lose the right to produce or control the disposition of the production from the particular tract and that right passes exclusively to the unit organization. It follows that any prior authorization as to receiving oil for purchase from the particular tract becomes a nullity.

The statutes under which the instant unitized management of a common source of supply was created provide that there be an apportionment of the unit production among the separately owned tracts within the unit. The statute provides in part as follows:

Sec. 286.9 provides:

"Each unit created under the provisions of this Act shall be a body politic and corporate, capable of suing, being sued and contracting as such in its own name. Each such unit shall be authorized on behalf and for the account of all the owners of the oil and gas rights within the unit area, without profit to the unit, to supervise, manage and con-

duct the further development and operations for the production of oil and gas from the unit area * * *.

* * * * * *

"A one-eighth (1/8) part of the unit production allocated to each separately-owned tract shall in all events be regarded as royalty to be distributed to and among, or the proceeds thereof paid to, the royalty owners free and clear of all unit expense and free of any lien therefor."

The plan of unitization herein adopted provides the unit expense is to be paid from the share of the unit production that would otherwise go to the various lessees of the separately owned tracts within the unit. The plan of unitization contains a provision as follows:

"To the extent that any person entitled to take and receive in kind any portion of the Unit Production shall fail to take and receive the same currently as and when produced, the Unit Operator, as agent and for the account and at the expense of such person, is authorized to market and sell or itself purchase, at *not less* than the market price prevailing at the time of such sale, the portion of Unit Production not so taken in kind by the person entitled to take and receive the same. Proceeds of the Unit Production so sold, or purchased by the Unit Operator, shall be paid by the Unit Operator to the person or persons for whose account the same is so marketed." (Emphasis added.)

■ The unit organization with its operator stands in a position similar to that of a trustee for all who are interested in the oil production either as lessees or royalty owners. The law applicable to this unitization required no notice to royalty owners, and afforded them no voice in the organization or management of the unit or in the selection of the unit operator.

In Magruder v. Drury, 235 U.S. 106, 120, 35 S.Ct. 77, 82, 59 L.Ed. 151, 156, it was said:

"It is a well-settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to in any wise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity. 'It therefore prohibits a party from purchasing on his own account that which his duty or trust required him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells.' Michoud v. Girod, 4 How. 503, 555, 11 L. Ed. 1076, 1099."

In Bruun v. Hanson, 9 Cir., 103 F.2d 685, 698, it was said:

"Among various duties of trustees, there is a general one described in 65 C.J. 652, § 520, as follows: 'In administering the trust, the trustee must act for the beneficiaries, and not for himself in antagonism to the interests of the beneficiaries; he is prohibited from using the advantage of his position to gain any benefit for himself at the expense of the cestui que trustent, and from placing himself in any position where his self-interest will, or may, conflict with his duties as trustee, as a trustee is required to protect at all hazards, even to his own personal loss or disadvantage, the estate under his administration where his personal and individual interests conflict with those of the trust estate; and where a trustee uses trust property for his own personal advantage, plenary relief may be granted * * *'.

"One of the commonest illustrations where a conflict of interests appears, is a sale of trust property to the trustee individually. In such situations, the trustee should be attempting to sell the

property for as much as possible to benefit the trust estate, while at the same time, as an individual, he probably would be attempting to buy the property for as little as possible. * * * "

In many instances by these rules a trustee is positively forbidden to buy the trust property. In the case at bar we have seen by the quoted statute that the trustee is specifically authorized to purchase oil produced, but surely his duty to the royalty owners requires that he act with the highest fidelity when he purchases the oil as he did here.

■ It is fairly shown, and as we understand, is not denied that the unit operator and the unit operating committee knew that the price of $3 per barrel was fully available and that various royalty owners were paid at that rate, while the oil interests of these involved royalty owners were purportedly purchased and they were paid at the rate of $2.65 per barrel. With this knowledge by the trustees, these royalty owners were not notified of this higher price available. Surely these acts were not in keeping with the duty of the trustee, and fell far short of the high duty owed by the trustee, and resulted in unconscionable gain to the trustee at the direct loss to the royalty owners affected.

■ We hold the statutes require the operator of the unit, in this case, the defendant, to account to all the owners of oil rights within the unit area for their respective portions or percentages of the unit production at the highest market price available at the time of such production under the circumstances that such owners have not received in kind their share of such production, or have not expressly authorized the unit or the operator for the unit to deliver same to a particular purchaser.

■ Under the circumstances in proof herein, and undisputed, we hold the plaintiffs are entitled to a recovery against the defendant in the amount of $1,203.30, and costs of this action.

The plaintiffs contend they are entitled to maintain this action for the use and benefit of all other owners of oil royalty rights within the unit and similarly situated as the plaintiffs.

It was stipulated by the plaintiffs and the defendant that only the usual lessor's or landowner's ⅛th royalty on oil produced from the unit tracts is involved in this controversy. It was demonstrated in the evidence that there are several hundred royalty owners in similar situations as the plaintiffs. That they were entitled to an allocated percentage share of the production from the unit area during the period that Phillips Petroleum Company was buying and offering to buy oil from the unit area at $3 per barrel. They, too, were only paid at the rate of $2.65 per barrel, and, like the plaintiffs here, they had not authorized the unit to deliver their percentage share of the unit oil to any certain purchaser of oil.

12 O.S.1951 § 233, provides:

"When the question is one of common or general interest of many persons, or when the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

In State ex rel. Tharel v. Board of County Com'rs of Creek County, 188 Okl. 184, 107 P.2d 542, 545, with reference to the statute, supra, this court held that a class action was proper against certain tax payers, "because of their number, the similarity of their situation, and their common interest in the questions involved and in the result of the action."

■ Herein, there appears to be a complete similarity of the situation of the plaintiffs, royalty owners, and numerous others, owners of royalty interests within the unit. The legal questions raised in this action are of common or general interest to the many owners of royalty interests within the unit, and the character of the relief sought appears to be applicable to all. In these circumstances we hold the case is one falling within the provisions of the statute, supra, authorizing one to sue for the benefit of all.

For reasons hereinabove stated, the judgment of the trial court is reversed. The cause is remanded, and the trial court is

directed to enter judgment for the plaintiffs and against the defendant for the sum of $1,203.30, and to enter judgment directing the defendant to account to and pay all persons owning royalty interests on oil produced from the unit tracts involved herein during the time period involved herein, from September 28th to December 17th, such sums, respectively, that each of said royalty owners shall have received in proceeds for their percentage of the oil produced in said period a sum equal to $3 per barrel for said oil.

JOHNSON, V. C. J., and CORN, ARNOLD and O'NEAL, JJ., concur.

HALLEY, C. J., and WILLIAMS and BLACKBIRD, JJ., dissent.

WILLIAMS, Justice (dissenting).

I am of the opinion that the majority opinion incorrectly states both the facts and the law applicable thereto and I am therefore unable to concur therein.

Plaintiffs are the owners of certain mineral interests in 480 acres of land in the West Edmond Hunton Lime Field. Plaintiffs' interests in these lands were leased to Sohio Petroleum Company, Stanolind Oil & Gas Company and Peppers Refining Company, respectively, in separate tracts. The whole field, consisting of several thousand acres, was unitized under the provisions of House Bill No. 339, enacted by the Twentieth Session of the Oklahoma Legislature, title 52, Chap. 3b, Sess.Laws 1945, 1949 Suppl. to 52 O.S.1941 § 286.1 et seq., hereinafter referred to as the Unitization Act. This act was repealed by the legislature in 1951, but it was in full force and effect through the period with which this lawsuit is concerned. As a result of the unitization of this field in accordance with the provisions of the Unitization Act, the defendant, West Edmond Hunton Lime Unit, a body politic and corporate, was created as the unit organization. The general powers of the defendant unit, as prescribed by the Unitization Act and the plan of unitization adopted and approved by the Corporation Commission, consist of the authority on behalf and for the account of all *the lessees* within the unit area, without profit to the unit, to supervise, manage and conduct the further development and operation of the unit area for the production of oil and gas. The powers of the defendant unit are actually carried out by its operating committee, composed of one representative designated by each lessee within the unit area. The defendant unit's operations are supervisory and administrative only, however, and the actual physical operation of the field is carried on by the unit operator. Under the approved plan of unitization, Sohio Petroleum Company was designated as unit operator and acted as such operator throughout the period in question here. The importance of this point will be brought out later, and it should be borne in mind in connection therewith that Sohio Petroleum Company is not a party to the action. This operation by Sohio was in accordance with the provisions of the Unitization Act which provides that as to the unitization plan "the actual operations within the unit area may be carried on in whole or in part by the several lessees of leases within the unit area, subject to the supervision and direction of the unit, or may be conducted in whole or in part by the unit or some particular operator or operators of a lease or leases in the approved unit area depending upon what is most beneficial or expedient."

The facts in this case are not in controversy and are for the most part stipulated. It is necessary to set them out, however, for a complete understanding of the issues involved.

On January 14, 1942, plaintiffs executed an oil and gas lease to A. Gutowsky covering 80 acres of land involved here. This lease contains the following provision for royalty payments:

"To deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect wells on said land, the equal one-eighth part of all oil produced and saved from the leased premises."

After production of oil was obtained under this lease and on August 10, 1943, a contract was entered into by the plaintiffs

and other parties owning the oil produced wherein they agreed to sell such oil to Champlin Refining Company. The contract, or division order, set out all the terms and conditions of the sale. Champlin Refining Company is specifically designated as the purchaser; the term of the sale is from the date of the first oil run until further notice, and the price to be paid is designated as the price posted by the Champlin Refining Company on the day when such oil is received by Champlin Refining Company. It was specifically stipulated by the parties hereto that this lease and division order have been in full force and effect since the date of first production from plaintiffs' land. After unitization of this field was completed on November 18, 1947 Champlin continued to purchase the oil allocated to plaintiffs' land and plaintiffs have been paid for their share of the allocated oil in accordance with the division order to Champlin Refining Company, by Champlin checks accompanied by run statements for the period covered by each check. The situation with respect to the rest of plaintiffs' land was the same as that of the 80 acres hereinabove set forth except for minor differences in dates and parties.

Throughout the period of time in question, Sohio Petroleum Company, Champlin Refining Company, Continental Oil Company and Phillips Petroleum Company were all purchasers of crude oil, in the West Edmond Field under contracts with various royalty and working-interest owners. At all times material herein the market price posted by all such purchasers was $2.65 per barrel, except that from September 28, 1948, to December 17, 1948, Phillips Petroleum Company posted and paid a price of $3 per barrel for the oil purchased by it. Thereafter Phillips returned to the $2.65 per barrel price.

Defendant has never entered into any lease, contract, or division order with plaintiffs nor solicited the execution of such lease, contract or division order. Plaintiffs have at no time sought to rescind, terminate or modify the lease and division order executed by them and at no time sought to have their share of the oil produced sold to anyone other than the purchaser they had designated in the division order. During the period in which Phillips Petroleum Company posted a higher price than the other purchasers, some royalty owners in the field terminated their contracts with other purchasers by giving notice thereof and entered into new contracts with Phillips Petroleum Company whereby they agreed to sell their share of the oil produced to Phillips and Phillips agreed to purchase the same, but plaintiffs were not among such royalty owners.

The majority opinion holds that defendant was a trustee for plaintiffs, was specifically authorized to purchase oil produced, did purchase oil and that its duty to plaintiffs required it to act with the highest fidelity. It further holds that the statutes require the unit operator (which the opinion says is the defendant in this case) to account to all the owners of oil rights within the unit area for their respective portions or percentages of the unit production at the highest market price available at the time of such production. I find there is simply no basis either in fact or law for such a holding. So far as the record in this case reveals, the defendant has never at any time either bought or sold a single drop of oil, either the plaintiffs' or anyone else's. The defendant is not even authorized to buy or sell oil except under certain very restricted circumstances, which circumstances do not exist and have never existed in the case at bar. It is true that the unit operator, Sohio Petroleum Company, is one of the purchasers of crude oil from the field, but Sohio is not the defendant in this case and is not even a party. Furthermore, the record does not reveal that Sohio ever bought one drop of plaintiffs' oil at any price. All Sohio did was to deliver plaintiffs' share of the oil produced to the purchaser designated by plaintiffs, to-wit: Champlin Refining Company, and Champlin Refining Company paid plaintiffs direct the agreed purchase price for said oil.

In order to better understand the situation existing here, it is necessary to set out certain portions of the unitization act and the unitization plan approved for this field which are particularly pertinent.

Section 10 of the Unitization Act is as follows:

"Property rights, leases and other contracts, and all rights and obligations shall meet the provisions and requirements of this Act and to any valid and applicable plan of unitization or order of the Commission made and adopted pursuant hereto, but otherwise to remain in full force and effect.

"Nothing contained in this Act shall be construed to require a transfer to or vesting in the unit of title to the separately-owned tracts or leases thereon within the unit area, other than the right to use and operate the same to the extent set out in the plan of unitization; nor shall the unit be regarded as owning the unit production. The unit production and the proceeds from the sale thereof shall be owned by the several persons to whom the same is allocated under the plan of unitization. All property, whether real or personal, which the unit may in any way acquire, hold or possess shall not be acquired, held or possessed by the unit for its own account but shall be so acquired, held and possessed by the unit for the account and as agent of the several lessees and shall be the property of such lessees as their interests may appear under the plan of unitization, subject, however, to the right of the unit to the possession, management, use or disposal of the same in the proper conduct of its affairs, and subject to any lien the unit may have thereon to secure the payment of unit expense.

"The amount of the unit production allocated to each separately-owned tract within the unit, and only that amount, regardless of the well or wells in the unit area from which it may be produced, and regardless of whether it be more or less than the amount of the production from the well or wells, if any, on any such separately-owned tract, shall for all intents, uses, and purposes be regarded and considered as production from such separately-owned tract, and, except as may be otherwise authorized in this Act, or in the plan of unitization approved by the Commission, shall be distributed among or the proceeds thereof paid to. the several persons entitled to share in the production for such separately-owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production or proceeds thereof from such separately-owned tract had not said unit been organized, and with the same legal force and effect. If adequate provisions are made for the receipt thereof, the share of the unit production allocated to each separately-owned tract shall be delivered in kind to the persons entitled thereto by virtue of ownership of oil and gas rights therein or by purchase from such owners subject to the right of the unit to withhold and sell the same in payment of unit expense pursuant to the plan of unitization, and subject further to the call of the unit on such portions of the gas for operating purposes as may be provided in the plan of unitization.

"Operations carried on under and in accordance with the plan of unitization shall be regarded and considered as a fulfillment of and compliance with all of the provisions, covenants, and conditions, express or implied, of the several oil and gas mining leases upon lands included within the unit area, or other contracts pertaining to the development thereof, insofar as said leases or other contracts may relate to the common source of supply or portion thereof included in the unit area. Wells drilled or operated on any part of the unit area no matter where located shall for all purposes be regarded as wells drilled on each separately-owned tract within such unit area."

The approved plan of unitization, which in effect constitutes the character under which defendant operates, contains provisions identical with the statutory provisions above set forth, and in addition contains the following pertinent provisions:

"Except as may be otherwise authorized or provided in this plan of unitiza-

tion, and provided adequate provisions are made for the receipt thereof, the share of the unit production allocated to each separately owned tract shall be delivered in kind to the persons entitled thereto by virtue of ownership of oil and gas rights therein or by purchase from such owners, subject, however, to the right of the unit operator to withhold and sell the same in payment of unit expense pursuant to this plan of unitization, * * *.

"To the extent that any person entitled to take and receive in kind any portion of the unit production shall fail to take and receive the same currently as and when produced, the unit operator, as agent and for the account and at the expense of such person, is authorized to market and sell or itself purchase at not less than the market price prevailing at the time of such sale or purchase, the portion of unit production not so taken in kind by the person entitled to take and receive the same. Proceeds of the unit production so sold or purchased by the unit operator, shall be paid by the unit operator to the person or persons for whose account the same is so marketed."

Thus it may be seen that the defendant unit is only authorized to sell oil produced from the unit when necessary to do so in order to effect collection of the unit operating expense. By the terms of the plan of unitization, however, only the $\frac{7}{8}$ths working-interest of the lessees is subject to such sale and plaintiffs' $\frac{1}{8}$th royalty is not subject to any expense of operation or to be sold for such expense. The defendant unit therefore has no authority to effect any sale of plaintiffs' share of the unit production whatsoever. And, of course, the record reveals that defendant never made or attempted to make any such sale. Of course, the plan of unitization does authorize the unit operator (who is not a party to this suit) to market and sell or itself purchase that portion of the unit production which the person entitled to take and receive fails to take and receive when produced. However the record reveals that the unit operator made no such sales and

the contingency under which it was authorized to make such sales never arose. Furthermore, if such contingency had arisen and such sale had actually been made, all the unit operator would have had to account to the royalty owners for would have been the market price prevailing at the time of such sale. The majority opinion erroneously places the onerous duty on the operator of obtaining the *highest* market price available, but it is unable to point out any statute, agreement, lease, division order or anything in the unitization plan or order which would entitle plaintiffs to more than the *prevailing* market price if their share of the production had in fact been sold by or purchased by the unit operator. It should be obvious that the prevailing market price is by no means necessarily the highest price available. A discussion of this point is really immaterial, however, since the unit operator is not a party to this action and since the record reveals that neither the unit operator nor the defendant unit ever sold or marketed any of plaintiffs' share of the unit production nor were they ever authorized to do so under the conditions shown to exist during the period in question under the applicable statutes and plan of unitization. Obviously, then, the majority opinion is in error in stating that the defendant was authorized to purchase oil produced, in stating that the defendant did purchase such oil, in stating that gain resulted to the defendant and loss to plaintiffs, and in stating that the defendant must account for all production at the highest market price available.

Although the record reveals that plaintiffs entered into a contract in the form of a division order with Champlin Oil Refining Company for the sale of plaintiffs' share of the oil, which contract was at all times carried out, the majority opinion holds that the unitization of the field nullified this division order solely on the ground that a division order which applied to oil produced from a particular tract of land could not apply to a percentage of the oil produced from the entire unit area. In this connection the majority opinion states:

"Obviously, an authorization to receive individually owned oil for pur-

chase from wells located on a particular tract of land by the owners of the oil produced therefrom is not an authorization to receive other oil elsewhere produced."

This holding is made in the face of a written stipulation entered into by the parties hereto and shown in the record in pertinent part as follows:

"6. The division order attached hereto and marked exhibit 'D' *is a form of division order executed by plaintiffs covering their proportionate part of the production from said unit* * * *

"7. The oil and gas lease and division order, respectively marked exhibit 'C' and 'D', or like instruments containing similar provisions provided for and directed the manner of payment for plaintiffs' proportionate part of the production from said leases *and said orders have been in full force and effect since date of first production from plaintiffs' tracts."* (Emphasis added.)

Not only does the majority opinion disregard and nullify the stipulation of the parties hereto, but it completely ignores the applicable provisions of the unitization statute and the approved plan of unitization. These division orders were maintained in force by the express provisions of the statute, as witness the following pertinent parts of section 10 of the unitization act:

"*Property rights, leases and other contracts, and all rights and obligations* shall meet the provisions and requirements of this Act and to any valid and applicable plan of unitization or order of the Commission made and adopted pursuant hereto, but *otherwise to remain in full force and effect.* * * *

"*The amount of the unit production allocated to each separately-owned tract* within the unit, and only that amount, regardless of the well or wells in the unit area from which it may be produced, and regardless of whether it be more or less than the amount of the production from the well or wells, if any, on any such separately-owned tract, *shall for all intents, uses, and purposes be regarded and considered as production from such separately-owned tract,* and * * *. shall be distributed among or the proceeds thereof paid to the several persons entitled to share in the production for such separately-owned tract *in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production or proceeds thereof from such separately-owned tract had not said unit been organized,* and with the same legal force and effect. * * *

"Operations carried on under and in accordance with the plan of unitization shall be regarded and considered as a fulfillment of and compliance with all of the provisions, covenants, and conditions, express or implied, of the several oil and gas mining leases upon lands included within the unit area, *or other contracts pertaining to the development thereof,* * * *. Wells drilled or operated on any part of the unit area no matter where located *shall for all purposes be regarded as wells drilled on each separately-owned tract within such unit area."* (Emphasis added.)

It is well settled that a division order is a contract. Texas Co. v. Pettit, 107 Okl. 243, 247, 220 P. 956, 231 P. 463. It should therefore be obvious that the division order executed by plaintiffs falls squarely within the above quoted provisions of the statute and was at all times in full force and effect. Furthermore, in every case heretofore considered by this court involving the effect of unitization it has been uniformly held that in interpreting contracts the allocated oil shall be "for all purposes" substituted for and considered as oil produced from the leased premises and that a well drilled anywhere on the unitized premises is for all purposes a well drilled on the leased premises. Blevins v. Harris, 172 Okl. 90, 44 P. 2d 112; Godfrey v. McArthur, 186 Okl. 144, 96 P.2d 322; McClain v. Harper, 206 Okl. 437, 244 P.2d 301.

The majority opinion is further erroneous in that it declares defendant to be a trustee owing the highest fidelity to plaintiffs. Such a holding is squarely contrary to our previous holdings. It is readily ap-

parent from the foregoing quotations that the effect of the unitization of this field was to merely substitute the unit operator for the various lessees of the separate tracts in the unit in the physical operation of the leases. In Bunger v. Rogers, 188 Okl. 620, 112 P.2d 361, 363, we held that there was no fiduciary relationship between lessor and lessee, saying:

> "The defendants were merely lessees under an oil and gas mining lease and were under no obligation to the plaintiff, other than to pay the rent and royalty provided in said lease, and if they breached this duty then their liability was purely a contractual one *and* in no sense *fiduciary*." (Emphasis added.)

The limitations of time and space do not permit a more detailed analysis of the erroneous nature of the majority holding, but at least one more point should be mentioned, at least briefly, before closing.

The majority opinion holds that plaintiffs, who are merely two out of several thousand royalty owners in the field, are entitled to maintain this action for the use and benefit of all other owners of oil royalty rights within the unit and similarly situated as plaintiffs, and proceeds to enter a judgment "directing the defendant to account to and pay all persons owning royalty interests on oil produced from the unit tracts involved herein during the time period involved herein, from September 28th to December 17th, such sums, respectively, that each of said royalty owners shall have received in proceeds for their percentage of the oil produced in said period a sum equal to $3 per barrel for said oil."

To my mind such a judgment is erroneous. It grants a money judgment to a large group of unidentified persons who are not before the court without regard to whether they desire such a judgment or not and without any individual pleading of the separate cause of action of the real parties in interest and without proof or authority or any evidence on which to base such a judgment being presented. It is ele-mentary that the rights of the various royalty owners in the field are dependent upon the individual contracts that they have entered into. The majority opinion states that there appears to be a complete similarity of the situation of the plaintiffs and numerous other owners of royalty interest within the unit. I am unable, however, to ascertain the source of this appearance of similarity from the record before us. The only similarity that I can discover from the record is that there appear to have been a number of other royalty owners who sold their share of the production to purchasers other than Phillips. We are not advised under what conditions any of such sales were made, however, with the exceptions of plaintiffs' sale to Champlin. It does appear from the record that some royalty owners had sold exclusive options to purchase their share of the production to certain pipe-line companies. Obviously such persons would not be in the same situation as plaintiffs. It further appears that some royalty owners have entered into division order contracts which require 30 days notice of termination before either party may withdraw therefrom. Obviously these persons are not in the same situation as plaintiffs. It also appears that some royalty owners requested a transfer of the sale of their share of the production to Phillips and that others did not. Numerous other distinctions could be noted, but the point to be made is simply that the claim of each individual royalty owner, if any he may have and care to assert, is dependent upon the factual situation prevailing in his particular case and in no wise dependent in any manner upon plaintiffs' recovery or lack of recovery. Defenses of estoppel, ratification, laches, or the statute of limitations might be successfully asserted against some royalty owners and not against others.

I am unable to concur in the majority opinion in any respect, and therefore respectfully dissent.

I am authorized to state that HALLEY, C. J., concurs with the views herein expressed.