Daniel J. OLANSEN, Ruby Olansen, David A. Olansen, Lorene Olansen, Earl Broomhall, Barbara Broomhall, Appellees, and Cross-Appellants,

Frances A. Bradley and John A. Hennage, Executor of the Estate of Mayme B. Hennage, Appellees,

v.

TEXACO INC. and Kerr-McGee Corporation, Appellants, and Cross-Appellees.

No. 48563.

Supreme Court of Oklahoma.

Oct. 24, 1978.

Rehearing Denied Dec. 18, 1978.

John M. Imel and Steven A. Stecher, Martin, Logan, Moyers, Martin & Conway, Tulsa, for appellants, and cross-appellees.

W. L. Eagleton, James R. Eagleton, and George H. Bowen, Tulsa, for appellees, and cross-appellants.

Ralph R. Adkisson, Smith, Brown, Martin & Adkisson, Tulsa, for appellees.

IRWIN, Justice.

Texaco commenced unitization proceedings under the Unitized Management of Common Sources of Supply Act (52) O.S. 1971, §§ 287.1 et seq.) in order to conduct secondary recovery operations by water flooding. Texaco was the sole lessee of all the minerals sought to be unitized. Pursuant to Texaco's application, the East Glenn Unit was created by order of the Oklahoma Corporation Commission, effective June 1, 1961, and Texaco was named the "unit operator".[1]

Certain appellees (Olansens and Broomhalls), referred to as the Olansens, owned a 40 acre mineral interest included in the unit and should have been entitled to the royalty attributable thereto under the plan of unit-

---

1. The parties make no distinction between Texaco's status as (1) the sole lessee of all the minerals in the unit, (2) the applicant for the unitization, or (3) the unit and/or the unit operator.

ization. However, the Olansens were not named as owners, were not notified of the unitization proceedings, did not participate therein, and such royalty was not paid to them but was improperly paid to the other appellees (Bradley and Hennage), referred to as the Flanagan Heirs. Flanagan Heirs' predecessor in interest had previously owned the 40 acre tract and had conveyed it to the Suttons by warranty deed. Suttons conveyed it by warranty deed to the Olansens' predecessor in interest in 1927. The mix-up in royalty payments arose because Texaco's files reflected that the Flanagan Heirs still owned the 40 acre tract and Texaco determined the mineral ownership from its own files instead of the county records. Texaco not only conducted the unitization proceedings under the belief that the Flanagan Heirs owned the mineral interest but caused the royalty payments to be made on the same basis.

The principal issues presented are (1) the Olansens' right to recover from Texaco the royalty they should have been entitled to receive under the plan of unitization, (2) Texaco's right to recover against the Flanagan Heirs for the royalty payments improperly made to them, and (3) the amount of attorney fees.

In 1972, the Olansens commenced proceedings to quiet title to the surface and all the minerals underlying the 40 acre tract and for an accounting of all the royalties attributable to the 40 acre mineral interest. Texaco and the Flanagan Heirs were joined as co-defendants. Subsequently, Kerr-McGee was made an additional party defendant because it purchased the unit production. Texaco and Kerr-McGee filed a cross-petition against the Flanagan Heirs alleging that if they were required to account to the Olansens for the royalty attributable to the 40 acre tract, then in turn, they should be entitled to a judgment over against the Flanagan Heirs because

such royalty had been improperly paid to them.

Early in the litigation the trial court quieted the Olansens' title to the surface of the 40 acre tract. This judgment was not appealed and is not in issue here. A separate trial was had on Olansen's quiet title action relating to the minerals and the accounting phase. The trial court quieted Olansens' title to the 40 acre mineral interest and also granted the Olansens a judgment against Texaco and Kerr-McGee for all the royalties accruing between 1961 and 1972[2] with interest and attorney fees. The trial court also refused to grant Texaco and Kerr-McGee a judgment over against the Flanagan Heirs for the royalty improperly paid to them on the grounds that their action was barred by laches.

Texaco and Kerr-McGee appealed from that part of the judgment in favor of the Olansens relating to the royalty payments and attorney fees and from that part of the judgment which refused them recovery against the Flanagan Heirs for the royalty improperly paid to them. Olansens cross-appealed as to the amount of attorney fees awarded them and contend such fees were grossly inadequate.

The 40 acre mineral interest involved here is the NE¼ of a 160 acre tract. Texaco's predecessors obtained an oil and gas lease on the entire 160 acres in 1919 and the lease, prior to the unitization, had been held by production from the West ½ of the 160 acres. The lease did not have an entirety clause and prior to unitization only the mineral owners under the W½ were entitled to the production. The Olansens had never been entitled to any royalty payments until the creation of the unit in 1961.

The Morrison family owned the 160 acre tract in 1919 and executed the oil and gas lease. The lease contained a "notification to lessee of change in ownership" clause.[3]

2. The royalty payments were held in suspense after the action was filed.

3. The 1919 Morrison lease provided in part: "If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed the covenants

hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of rentals "or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer or assignment or a true copy thereof . . . ."

In 1921 the Morrison family conveyed the 160 acre tract to J. P. Flanagan. This deed was filed for record and Texaco was notified of the change in ownership pursuant to the lease requirement. In 1927, Anthony Olansen obtained title to the 40 acre tract in question by warranty deed. This deed was filed for record but Texaco was not notified of the change in ownership. Anthony Olansen died in 1929 and the 40 acres were inherited by his wife, Annie, and his two sons, David and Daniel. Annie died in 1947 and the entire 40 acres were then owned by David and Daniel. The estates of Anthony and Annie were not probated. However, since 1927, Anthony Olansen, his heirs and their assigns have been in exclusive and absolute possession of the 40 acre tract.

Texaco's files never reflected the Olansens' ownership of the minerals. Texaco relied upon its own files instead of the county records to determine the mineral ownership and who should participate in the unitization proceedings and royalty payments. Since Texaco's files did not reflect that the Olansens had an interest in the minerals unitized, Texaco did not give them notice of the unitization proceedings and the Olansens did not participate in such proceedings.

Two omissions one on the part of Texaco and the other on the part of the Olansens, created the background for this controversy. Texaco did not search the county records prior to instituting unitization proceedings, acting instead in reliance upon its files to ascertain ownership of the minerals, and Olansens' failure to notify Texaco of their ownership of the 40 acre mineral interest. Texaco's failure to give actual notice to the Olansens is defended on two theories, (1) Olansens were not entitled to notice because they were not "owners" for the purposes of the unitization proceedings in that they failed to comply with the "change in ownership" clause of the lease, and (2) Texaco fully complied with the laws relating to notice in unitization proceedings whether Olansens are or are not considered to be owners of the minerals.

The unitization proceedings were commenced when Texaco filed its application for the creation of the East Glenn Unit. Hearing was then set by the Corporation Commission and Notice of Hearing was published as required by law. No notice was served on the Olansens of Texaco's Application or of the hearing. The record supports the trial court's finding that the Olansens did not have knowledge that the 40 acre mineral interest was included in the East Glenn Unit until 1972, the year they commenced this action.

The trial court found that Texaco committed actual or constructive fraud upon the Olansens and the Corporation Commission when it represented in the unitization proceedings that all the owners had signed and ratified the plan for the East Glenn Unit. It is conceded that the Olansens, who were owners, had not signed or ratified the plan.

Texaco contends the trial court erred in finding that it was negligent and guilty of fraud in not determining that the Olansens owned the 40 acre mineral interest and notifying them of the unitization proceedings. As Texaco points out, it is admitted that neither Anthony Olansen, the original Olansen grantee, his heirs nor their assigns, gave notice to Texaco of change in ownership as required by the lease. Texaco argues that until it was notified of such change it could rely upon its files for the unitization proceedings and that compliance with the notification clause was a condition precedent to the contractual obligation to pay royalties to any subsequent royalty owner such as the Olansens. Texaco also argues that the plan of unitization contained a similar clause and that it was not bound by a change in ownership until proper notification of such change was given as therein required.

There is no showing whatsoever that Texaco intentionally denied any rights to any royalty owner in the formation and operation of the unit, and we are not con-

cerned with the change in ownership clause in the plan of unitization because such clause relates only to those changes in ownership occurring after adoption of the plan and creation of the unit by order of the Commission. The "change in ownership" clause in the plan of unitization has no bearing upon the rights and responsibilities in the present proceedings. The controlling issue is purely legal, may Texaco rely upon the "change in ownership" clause in its oil and gas lease and its files in forming the unit. If it could rely upon its files as a basis from which to create the unit, the "change in ownership" clause in the unitization plan might become material as it could affect rights in the event of subsequent transfers of interest.

Change in ownership clauses which relieve a lessee from liability for the mispayment of royalty or delay rentals, when the mispayment is caused by a change in ownership and no notice is given to the lessee of such change, have been upheld and enforced. *Gypsy Oil Co. v. Schonwald,* 107 Okl. 253, 231 P. 864 (1924); *Cassity v. Smith,* 193 S.W.2d 991 (Tex.Civ.App.1946); for other cases see Summers, Oil and Gas (2nd Ed.), § 590, and Brown, The Law of Oil and Gas Leases, § 11.02.

 In our opinion, Texaco may not rely upon the change in ownership clause contained in the oil and gas lease in these proceedings although it may have been entitled to rely upon such clause prior to the creation of the East Glenn Unit. In the first place the creating of the unit amended and modified the rights and obligations Texaco and Olansens had under the oil and gas lease. 52 O.S.1971, § 287.9, states:

"Property rights, leases, contracts, and all other rights and obligations shall be regarded as amended and modified to the extent necessary to conform to the provisions and requirements of this Act and to

any valid and applicable plan of unitization or order of the Commission made and adopted pursuant thereto, but otherwise to remain in full force and effect."

In *Young v. West Edmond Hunton Lime Unit,* Okl., 275 P.2d 304 (1954) we said:

"* * * upon unitization the landowner lessors lost their right to have their contracted lessees develop and produce their individually owned acreage for the joint benefit of the lessor and lessee, and instead the lessors looked to the unit organization to produce all acreage together as a single unit and to account to lessors for their allocated percentage of aggregate unit production. Thus by statute when a tract of land becomes a part of a field brought under unitized management the owners of the mineral rights and interests in such particular tract lose the right to produce or control the disposition of the production from the particular tract and that right passes exclusively to the unit organization."

It is apparent that the creation of the East Glenn Unit changed the rights of the parties in the case at bar. Prior to the creation of the unit, Olansens had never been entitled to nor received any production payments from their 40 acre mineral interest because no production was ever attributable to such tract. While Olansens were not entitled to participate in the royalty under the terms of the lease, they became entitled to share in the unit production after the unit was created even though no oil or gas was actually produced from under the Olansens' tract.

 The plan of unitization had to be approved by the owners of record of not less than 63% of the normal one-eighth royalty interest before it became effective. 52 O.S.1971, § 287.5.[4] There is no language in

---

4. 52 O.S.1971, § 287.5 provides in pertinent part:

"No order of the Commission creating a unit and prescribing the plan of unitization applicable thereto shall become effective unless and until the plan of unitization has been signed, or in writing ratified or approved by lessees of

record of not less than sixty three per cent (63%) of the unit area affected thereby and by owners of record of not less than sixty three per cent (63%) (exclusive of royalty interests owned by lessees or by subsidiaries of any lessee) of the normal one-eighth ($\frac{1}{8}$) royalty interest in and to the unit area, and the Com-

the Unitization Act suggesting that a lessee-applicant for a plan of unitization may rely upon its own files to determine who must ratify and approve a plan of unitization. Nor is there any language suggesting that anyone but the true "owner" may approve a plan of unitization. On the contrary, the Act presupposes that at the time a unit is created all the respective rights and interests of lessees and lessors alike are known with all those interested having had an opportunity to participate in the unitization proceedings. Texaco's land files supposedly kept current by mineral owner's compliance with the "change in ownership" clause may not constitute the basis for the exercise of the State's police power under the Unitization Act when in conflict with the actual "owners" as disclosed by the county records. We hold that Texaco may not rely upon its "change in ownership" clause as a defense to liability for failing to ascertain that the Olansens were the record owners of the 40 acre mineral interest.

The next issue presented concerns the kind of notice the owner of leased minerals (royalty owners) are entitled to receive in unitization proceedings and whether such notice was given in the case at bar. Texaco contends that it proceeded in accordance with the statutes and Rules of the Corporation Commission and that neither the statutes nor the Commission's Rules [5] required it to serve notice on the Olansens or any other lessor-royalty owner. The fact there may have been no statutory requirements or Rule of the Corporation Commission requiring Texaco to serve notice on the lessors (the Olansens) is not dispositive of the failure of notice issue.

■ By implication at least, the conservation statutes for compulsory unitization require some kind of actual notice (i. e. notice consistent with the due process

clause) to the owner-lessor because a plan of unitization not only amends and modifies the lessor-lessee rights and duties under the oil and gas lease but may not become effective until approved or ratified by the owners of record of not less than 63% of the normal one-eighth (⅛) royalty interest. 52 O.S.1971, § 287.5; and, *Eason Oil Company v. Corporation Commission,* Okl., 535 P.2d 283 (1975).

■ Under the due process clause of the United States Constitution the Olansens, whose interest and whereabouts could have been easily ascertained, were entitled to more notice than notice by publication of the unitization proceedings. In *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865, the U.S. Supreme Court said that an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The Court also said that the right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. The Court refused to sanction notice by publication to those whose identity and addresses were ascertainable from sources readily at hand. The *Mullane* decision was followed by a series of opinions from the Supreme Court which further emphasized the necessity to take such investigative action as was reasonably necessary to identify members of a class to be given notice before notice by publication would be an acceptable alternative to actual notice. See *City of New York v. New York New Haven & Hartford Railroad Co.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953); *Covey v.*

---

mission has made a finding either in the order creating the unit or in a supplemental order that the plan of unitization has been so signed, ratified or approved by lessees and royalty owners owning the required percentage interest in and to the unit area. * * * "

**5.** Olansens contend the Rules of the Corporation Commission required notice be served

upon them but the Rules relied upon by the Olansens would not have required Texaco to serve notice on royalty owners (Olansens) when this unit was created in 1960. However, Rule 11 of the present Oklahoma Corporation Commission Rules of Practice requires such notice.

*Town of Somers,* 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956); and *Walker v. City of Hutchison,* 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956).

The implications of the *Mullane* decision, and others following it were not entirely lost on attorneys specializing in the field of oil and gas conservation law. Olansens' evidence included memoranda from the legal department of a major oil company as early as 1957 which expressed concern of the possible application of *Mullane* and related decisions to notice in pooling and unitization proceedings. This major company undertook a search of the county records and served notice on the owners preliminary to its formation in 1958 of what was at that time, the largest secondary recovery unit in the state.

Even if *Mullane,* supra, and cases of similar import, were not enough to put Texaco on notice of the potential consequences of reliance upon notice by publication (52 O.S. 1971, § 287.6), a 1957 decision from the Oklahoma Federal District Court also pointed out the possible pitfalls involved in such practice. *Moore Oil v. Snakard,* 150 F.Supp. 250 (W.D.Okl.1957). Although that case involved a lessee and not a lessor, a pooling order and not a unitization proceeding, and the Commission Rules required notice to be served on the lessee, it is persuasive here. There, the Court said that the "import of the rule requiring notice in pooling applications to be given in a specific manner, consistent with prescribed procedure, is to satisfy the requirements of substantive due process of law," and, "a want of notice to interested parties, whose vested property interests are to be affected, falls far short of the requirements of due process."

In the case at bar, the Olansens' father was the record owner of the 40 acre mineral interest. Before the plan of unitization could become effective, not less than 63% of the owners of record of the normal ⅛ royalty interest had to approve or ratify the plan. The Olansens, who inherited the property, had a vested property interest that was to be affected by the unitization proceedings. The Olansens' homestead was on the 40 acre tract and the county records disclosed the Olansen ownership. It was not until 1972 that the Olansens became aware that their 40 acre mineral interest was included in the unit and they were entitled to share in the production. A check of the county records would have disclosed that the Flanagans conveyed by warranty deed the 40 acre tract to the Suttons in 1926 and in 1927 the Suttons conveyed by warranty deed the entire 40 acre tract to the Olansens. Although Anthony Olansen, the record owner, had died before the unitization proceedings were commenced, the name and addresses of his heirs or personal representatives were ascertainable from sources readily at hand. We therefore conclude that the notice by publication, as required by statute, was insufficient to give notice to the Olansens that their 40 acre mineral interest had been included in a unitization proceeding.

What is the legal effect of Texaco's failure to give actual notice to Olansens' of the unitization proceedings?[6] Olansens contend this failure of notice constitutes a breach of duty owed to them as royalty owners by Texaco giving rise to their right to recovery on their action for an accounting. This breach of duty takes on added significance when analyzed in conjunction with the statute of limitations, which was raised as an affirmative defense by Texaco, and the nature of the relationship between Texaco as the unit operator and the Olansens, a royalty owner. This interconnection between failure of notice, limitations, and relationship of the parties may be found in the trial court's conclusions of law. The trial court found that a trust or fiduciary relationship exists between a unit or unit operator and the royalty owners in the unit. Consequently, the trial court continued, Texaco as unit operator was a trustee for Olansens and had a duty to account to them for all of the ⅛th royalty attributable to

6. Whether the Olansens could or could not set aside the unitization proceedings as the same affects their forty acre mineral interest is neither presented nor determined.

their 40 acre mineral interest. This trust or fiduciary relationship was also employed in another finding wherein the trial court found that no statute of limitations barred Olansens' claim for an accounting as against Texaco because Texaco was a trustee and limitations do not affect the rights of the cestui que trust so long as the trust relationship continues. The trial court relied upon and quoted excerpts from *Young v. West Edmond Hunton Lime Unit,* Okl., 275 P.2d 304 (1954); and *West Edmond Hunton Lime Unit v. Young,* Okl., 325 P.2d 1047 (1958), to sustain its conclusion that a trust or fiduciary relationship exists between the unit operator and the royalty owners in the unit. The trial court cited *Ludey v. Pure Oil Company,* 157 Okl. 1, 11 P.2d 102 (1932), to sustain its finding relating to limitations.[7]

The conduct giving rise to the first *Hunton Lime* case (275 P.2d 304) was the unit operator's breach of the implied covenant obligation to sell the unit production at the best available market price, i. e., the oil production was sold for $2.65 per barrel when it should have been sold for $3.00 per barrel. We held that a unit operation is in the nature of an operation by trustee and there is required a high degree of fidelity to all those entitled to receive a fixed and stated percentage of the production or its proceeds. In the second case (325 P.2d 1047) which involved the accounting phase of 275 P.2d 304 on remand, we held the unit must, by reason of the fiduciary relationship, account to the royalty owners as to the handling of their affairs, and that the unit is charged with the knowledge of and the identity of its membership, including the royalty owners, and as trustee, although acting in good faith, is accountable under the law for any breach of trust.

Olansens relied upon the *Hunton Lime* cases in the trial court and on appeal state that they are the "heart" of their case because they are basic and in point concerning the duties of the operator of a second-

ary recovery unit to the unit royalty owners and are the only Oklahoma decisions defining such duties. The force and effect of Olansens' argument is that Texaco, owed the same duties and obligations to the royalty owners in operating the East Glenn Unit that the *Young* cases held was owed to the royalty owners in reference to the sale of unit production, i. e. a trust or fiduciary relationship existed between them as royalty owners, and that Texaco's duties and obligations must be measured by this fiduciary relationship.

Texaco argues because this Court in the *Hunton Lime* cases utilized the terms "trustee" and "fiduciary" the trial court stretched that interpretation to the point of making a unit operator an insurer or guarantor of any royalty interests. Texaco says the facts in the case at bar are clearly distinguishable from the facts in the Hunton Lime cases and the "trust" or "fiduciary" relationship theory may not be imposed in the case at bar. Texaco also points out that some of the 1945 unitization laws in effect when the Edmond Hunton Lime Unit was created have been amended. Texaco asserts that the lessee-lessor relationship existing by reason of the oil and gas lease continues between the unit operator and the royalty owner after a unit is created, i. e. that it is in the nature of a lessee-lessor relationship, as the same may be amended or modified by the Plan of Unitization or by order of the Corporation Commission. Texaco argues that *Bunger v. Rogers,* 188 Okl. 620, 112 P.2d 361, is controlling. Bunger involved an action for an accounting under an oil and gas lease and the court held that plaintiff's 20 year claim was barred by the statute of limitations and the equitable doctrine of laches. In *Bunger* the court said:

"The defendants were merely lessees under an oil and gas mining lease and were under no obligation to the plaintiff, other than to pay the rent and royalty provided in said lease, and if they breach-

---

7. See 54 A.L.R.3rd 12 "What constitutes sufficient repudiation of express trust by trustee to cause the statute of limitations to run?", and

*Becker v. State ex rel Department of Public Welfare,* Okl., 312 P.2d 935 (1957).

ed this duty then their liability was purely a contractual one and in no sense fiduciary."

The pivotal issue here is not the relationship between a unit operator and a mineral owner but the critical concern involves the legal effect of resort to the police powers of the state on the part of a lessee (Texaco) in the unitization proceedings which modified and amended existing legal rights without constitutionally sufficient notice of such proceedings to the lessor (Olansens). Just as limitations cannot act to bar an individual's remedy where, without notice, his rights have been adversely affected by state action, neither will limitations prevent the vindication of rights acquired, without notice, until such a time as the person knows or should have known in the exercise of due diligence that rights inuring to his benefit exist. Since the Olansens (lessors) had no notice of the unitization proceedings that was consistent with due process, and they commenced this action in due time after having notice that their 40 acre tract had been included in the unit, there are no limitations which bar their action to collect the royalty payments due them.

Kerr-McGee contends the trial court erred in granting judgment against it in reference to the royalty and argues it had no knowledge of the Olansens' interest. Kerr-McGee takes the position Texaco properly accounted for the royalty under the terms of the oil and gas lease and the failure of the Olansens to give it notice of their ownership applies to its obligations as well as to Texaco's obligations. Kerr-McGee asserts that the rule of law which controls here is stated in 3A Summers, *Oil and Gas* (Perm.Ed.) Sec. 590, pg. 168, as follows:

> "Pipeline company purchasing oil from a lease is protected against conversion of royalty at the suit of a royalty owner in absence of notice of change of ownership in the royalty interest."

Although Kerr-McGee may have been entitled to have been protected by reason of the "notice of change of ownership" clause in the oil and gas lease when payments were being made under the lease, we are concerned here with payments made under the plan of unitization. The plan of unitization amended and modified the rights of the parties under the oil and gas lease and the Olansens had no notice of the unitization proceedings. Kerr-McGee has for all practical purposes placed itself on appeal in the same position as Texaco and has not suggested their liabilities are different. Since Kerr-McGee relies upon the "change in ownership" clause in the oil and gas lease; and we have determined that Texaco may not rely upon such clause; Kerr-McGee's contention that the trial court erred in rendering judgment against it in favor of Olansens as to the royalty may not be sustained.[8]

In reference to the alleged error if the trial court in refusing to grant Texaco and Kerr-McGee a cross-judgment against the Flanagan Heirs, the trial Court found that to grant such judgment would work a perceptible inequity considering Texaco's initial failure to properly search the record to ascertain the true status of the mineral ownership in the proposed unit and the passage of a considerable length of time. Thus, concluded the trial court, Texaco's and Kerr-McGee's claim against the Flanagan Heirs was barred by the equitable doctrine of laches.

Laches is an equitable defense to "stale claims". On numerous occasions this Court has announced the rule that before a claim will be considered barred by laches it must be shown that there has been an unreasonable delay in the enforcement of the claim and that by reason of this delay the defendant has been materially prejudiced. *Crumley v. Smith*, Okl., 397 P.2d 119 (1964). The application of the

---

**8.** By conforming its position to that of Texaco, Kerr-McGee failed to present any of its individual defenses to liability. This opinion should not be construed as holding or suggesting that the purchaser of production from a secondary recovery unit is necessarily liable for the mispayment of royalty.

doctrine is discretionary depending upon the facts and circumstances of each case as right and justice appear. *Marshall v. Amos,* Okl., 462 P.2d 500 (1968).

The Flanagan Heirs were entitled to receive the royalty payments under the W ½ of the 160 acre tract but were not entitled to the royalty payments attributable to the Olansens' 40 acre tract. Justifiably or not, the Flanagan Heirs believed they owned the mineral interest under the Olansens' 40 acre tract.

Although J. P. Flanagan and Lee Flanagan, husband and wife, conveyed this 40 acre tract to Arthur Sutton by warranty deed in 1926, they conveyed it to each other in 1950. This 1950 deed contained a survivorship clause and this provided: "The intent of this conveyance is to convey only the interest of the grantors in and to the mineral rights, said grantors claiming or asserting no title to the surface." When J. P. Flanagan died and probate of his estate was commenced, an inventory and appraisement of his estate was filed in December 1960, and a copy was furnished to Texaco. The inventory reflected that J. P. Flanagan owned the minerals under this 40 acre tract. In June, 1961, the Executor of J. P. Flanagan's estate signed the division order warranting title to the mineral interest and it was distributed as an asset of Flanagan's estate. The fact that repayment of those funds would work a perceptible hardship on them does not by itself demonstrate laches is applicable. The critical question is whether Texaco unreasonably delayed in proceeding with its claim for damages by reason of a breach of the warranties in the division orders signed by the Flanagan Heirs. After all, this is the claim assertedly barred for being too stale for equity to permit enforcement.

The Flanagan Heirs defended against the Olansens and the cross-petitions of Texaco and Kerr-McGee on the basis of title to the 40 acre mineral interest. They contended Olansens were not entitled to the royalty nor Texaco and Kerr-McGee entitled to judgment over for breach of warranty in the division orders because the minerals were never actually conveyed. The Flanagan Heirs alleged in their pleadings that the original conveyance from J. P. and Lee Flanagan of the 40 acre tract to Arthur Sutton in 1926 was a conveyance of the surface only. They also contended that by reason of a mutual mistake on the part of the parties to the 1926 conveyance the deed did not reserve the minerals. They attempted to prove the foregoing by evidence as to the conduct of the parties subsequent to the actual transfer. The trial court held in favor of the Olansens. This judgment quieting title became final and is not an issue here.

■ The first time the Flanagan Heirs' title to the minerals was questioned was a short time prior to Olansens commencing their quiet title and accounting action. Until the judgment was rendered on the quiet title aspect of the case there had been no breach of warranty under the division order, for at no time prior thereto had the fact of a failure of title been demonstrated with any certainty. Texaco and Kerr-McGee had cross petitioned against the Flanagan Heirs praying that should they be required to account, which necessarily included a judgment that Olansens' had title, then judgment should be entered in their favor for breach of warranty in the division orders. There was no delay. Texaco and Kerr-McGee asserted their claim for the breach of warranties when title was first questioned.

We hold the cross-claim of Texaco and Kerr-McGee against the Flanagan Heirs was not barred by the equitable doctrine of laches under the facts and pleadings presented and the trial court committed reversible error in so holding. We therefore reverse the judgment of the trial court in favor of the Flanagan Heirs against Texaco and Kerr-McGee and Texaco and Kerr-McGee's cross-action against the Flanagan Heirs is remanded for a new trial.

■ In connection with the $13,000.00 award for attorney fees in favor of the Olansens jointly against Texaco and Kerr-McGee, the trial court set forth different reasons why each would be liable. The trial

court found that the wrongful acts of Texaco involved the Olansens in litigation with other defendants which made it necessary for the Olansens to protect their interests and incur attorney fees and expenses which were recoverable from Texaco. The trial court relied upon *Security State Bank of Comanche v. Johnston & Co.*, 204 Okl. 160, 228 P.2d 169 (1951) to sustain the award against Texaco. In that case we held:

> "The general rule is that costs and expenses of litigation, other than the usual and ordinary court costs, are not recoverable in an action for damages, and such costs are not recoverable in a subsequent action; but, where the wrongful acts of defendant have involved plaintiff in litigation with others, or placed him in such relations with others as make it necessary to incur expense to protect his interest, such costs and expense should be treated as legal consequences of the original act."

Counsel for Olansens admitted, at the hearing to determine fees, that if the lawsuit had been against Texaco only, an attorney fee would not have been legally justified. The legal basis for Olansens' claim to an attorney fee is that Texaco involved them in litigation with third parties (Kerr-McGee and the Flanagan Heirs), thus making it significantly more expensive to litigate their rights.

It is evidence from the record that the trial court allowed Olansens an attorney fee for the legal expenses of the quiet title litigation against the Flanagan Heirs and none for the accounting litigation against Texaco and Kerr-McGee. Had the whole of the litigation been a proper subject for consideration in the awarding of an attorney fee, there would be merit to Olansens' contention that the $13,000.00 was inadequate. However, we think the trial court was correct in its application of the *Security State Bank Case,* supra, to the case at bar, and properly limited the fee to those legal services rendered in conjunction with the quiet title action against the Flanagan Heirs.

Had Texaco examined the record, the conveyance of the fee interest in the subject 40 acre tract by warranty deed from Flanagan to Olansens' predecessor in title would have readily appeared. Although later purported conveyances of the same tract's mineral interest by Flanagan may have cast some doubt on Olansens' title, any litigation at that time would have been inconsequential. At that point in time, the Flanagan Heirs had only a speculative interest in the royalty which might be attributed to the 40 acre tract after unitization. In 1972, the Flanagan Heirs were virtually forced to assert title as the most plausible defense to potential liability for the royalties received over the ensuing years. Failure of Texaco to ascertain Olansens' outstanding interest and to give them notice when the unit was created was proximate cause of the subsequent quiet title litigation between the Olansens and the Flanagan Heirs.

Likewise, we are of the view that the trial court properly limited the fee awarded to those legal services rendered in conjunction with the quiet title action against the Flanagan Heirs. Olansens state, in their brief in support of their cross-petition in error, that the $13,000.00 award is inadequate. In the hearing to determine attorney fees, the Olansens' evidence as to the amount was directed to the overall litigation which involved Texaco, Kerr-McGee and the Flanagan Heirs. They point out the amount of necessary litigation that was conducted against Texaco, and rely on testimony relating to a reasonable attorney fee were the whole of the litigation considered. In response to direct inquiries from the trial court as to the percentage of time attributable to the quiet title aspect of the case, none of the parties could come up with a definite estimate. Nevertheless, there was some evidence before the trial court from which to fix a fee representative of the quiet title portion of the overall litigation.

The record clearly demonstrates that the bulk of the litigation below was between Olansens and Texaco. Although an award of $13,000.00 might be considered generous in view of the limited portion of the litigation it represents, it cannot be said, as urged by Texaco, to be excessive nor can it

be said, as urged by Olansens', to be grossly inadequate.

The court found the Olansens were entitled to an attorney fee against Kerr-McGee on their implied contract as purchaser of the oil runs and that when Olansens' share of oil was sold to Kerr-McGee it was tangible personal property. Olansens argue that since it was tangible personal property it is included within the statutory phrase "goods, wares and merchandise" within the purview of 12 O.S.1971, § 936, and an attorney fee was allowable.

The provisions of 12 O.S.1971, § 936, afford no support for Olansens' contention. Admittedly, several minerals are "goods" within the meaning of § 936, supra, but the statute itself is restricted to awards of attorney fees in civil actions relating to contracts such as for the sale of goods. Olansens' theory of recovery against Kerr-McGee was one sounding in tort for conversion which would render § 936, supra, inapplicable.

Olansens' have asked that they be awarded an attorney fee for successfully defending the appeal of Texaco and Kerr-McGee. Olansens have no independent right to an attorney fee for appellate advocacy. An award of an attorney fee is premised on the same theory as that which justified the award of an attorney fee in the trial court. The attorney fee awarded in the trial court is not, technically speaking an attorney fee at all. *Security State Bank Case,* supra, authorizes the award of legal expenses, which may include an attorney fee, which were incurred in the litigation with third parties as a part of the damage suffered by plaintiff by reason of defendant's wrongful conduct. The very aspect of this litigation which rendered the rule in Security State Bank applicable, the quiet title action against the Flanagan Heirs, was not appealed. Olansens' have suffered no additional damage by having to defend the quiet title aspect of the case and are therefore not entitled to an additional award for legal expenses on appeal.

In summation, the judgment of the trial court as between appellants (Texaco and Kerr-McGee) in favor of appellees (Olansens and Broomhalls) on the issue of liability for mispaid royalties is affirmed. Judgment as between Texaco and the Olansens as to attorney fees is affirmed both as contested on appeal and on the cross-appeal of the Olansens. Judgment as between Kerr-McGee and Olansens and Broomhalls as to attorney fees is reversed. Judgment refusing to grant Texaco and Kerr-McGee recovery against appellees (Bradley and Hennage) for the improperly paid royalties is, as to them, reversed and remanded for a new trial.

LAVENDER, V. C. J., and WILLIAMS, BERRY, DOOLIN and HARGRAVE, JJ., concur.

SIMMS, J., concurs in result.

HODGES, C. J., concurs in part; and dissents in part. Dissents to that part of the opinion which reverses the trial court judgment in favor of the Bradleys and Hennages.

BARNES, J., concurs in part and dissents in part. Dissents to that part of the opinion which affirms the trial court judgment in favor of the Olansens and Broomhalls.